In the Matter of NORTH AMERICAN BUILDERS, INC., Bankrupt.

No. B 08346.

United States District Court, D. Nebraska.

Dec. 21, 1970.

Fay H. Pollock, Trustee, Norfolk, Neb., Robert K. Silverman, Omaha, Neb., for trustee.

William B. Woodruff, Omaha, Neb., for Lyle G. and Phyllis A. Neff.

## MEMORANDUM

RICHARD E. ROBINSON, Chief Judge.

This matter comes before the Court on the Petition For Review filed by Lyle

G. and Phyllis A. Neff and on the motion of the same parties to remand the case to the Referee In Bankruptcy, Honorable Jerrold L. Strasheim, for the taking of additional evidence.

North American Builders, Inc., the bankrupt was a manufacturer of mobile homes and was located in Neligh, Nebraska. Oscar Curtis has been the president of North American prior to July 24, 1968, up to the present time. Lyle G. and Phyllis A. Neff, husband and wife, are the brother-in-law and sister of Oscar Curtis; Willie and Ethel Curtis, husband and wife, are the parents of Oscar Curtis and are referred to as the "Elder Curtis's".

In his Memorandum the Referee put forth the facts as follows:

"On July 24, 1968, the Curtis's, the Neffs, and the elder Curtis's by parol created what they chose to call—as do I—a 'family trust' or simply a 'trust', designated the Neffs 'trustees' and Oscar Curtis 'agent' of the trustees, and opened a checking account in the Guardian State Bank in Alliance entitled 'Lyle G. or Phyllis A. Neff, trustees'—upon which either Lyle G. Neff or Oscar Curtis could draw checks on his own signature.

"On the same day, the six family members borrowed $100,000 from the Guardian State Bank on the strength of their combined personal credit. The bank advanced the first $50,000 thereof immediately by a deposit in the checking account and agreed to advance the remaining $50,000 in the future by deposits in the checking account as necessary to cover checks presented for payment.

"Still on July 24, 1968, Oscar Curtis, as president of North American, executed three promissory notes together with a security agreement and delivered them to the Neffs. Under the terms of the notes, North American, as maker, engaged that in six months it would pay $100,000 to 'Lyle G. Neff or Phyllis A. Neff, trustees,' payees. Under the security agreement, North

American, as debtor, '* * * to secure payment of the indebtedness evidenced by * * *' the three notes, granted to 'Lyle G. Neff or Phyllis A. Neff, trustees,' secured party, a security interest in thirteen mobile homes identified by serial numbers and also in '* * * ALL OTHER MOBILE HOMES THAT MAY HEREAFTER BE MANUFACTURED OR ACQUIRED BY THE DEBTOR AT ANY TIME UNTIL THE INDEBTEDNESS SECURED HEREBY IS FULLY PAID. * * *' In the event of default, which was defined to include among other things both nonpayment and commencement of any involuntary proceedings under the bankruptcy laws, the security agreement provided in part that the Neffs could 'declare all obligations secured hereby immediately due and payable' and that they were to have 'the remedies of a secured party under the Nebraska Uniform Commercial Code.' There was no money advanced to North American concurrently with the execution and delivery of the three notes."

Apparently, the purpose of undergoing the transaction set out above was to provide North American with a continuous source of capital, and yet secure for the Neff Trust security for money advanced. During the period loans were outstanding the Neff Trust intended to perfect same by a security interest against mobile homes that were being manufactured. The security interest in the mobile homes was to be perfected through delivery and retained possessions of the Manufacturer's Certificate of Origin [M.C.O.]. When the mobile home was sold, the M.C.O. was surrendered to the purchaser and the proceeds of such sale was repaid to the Neff Trust and then was reloaned against another mobile home.

Oscar Curtis was the agent for the Neff Trust and he handled, managed, and controlled the trust account, and the Neffs were nothing more than nominal heads of the Trust. Oscar Curtis thus wore two hats. He caused the loans to

be made by drawing and signing checks on the checking account payable to North American, and perfected the security interests by retaining the M.C.O.'s as agent for the Neff Trust, and on the other hand was, as the president of North American, the recipient of the money.

Oscar Curtis testified at the hearing that he held the floor plan M.C.O.'s in a steel box at his home.

Shortly after the involuntary petition was filed the Receiver took possession from North American, nine mobile homes that were located on its premises. It is those nine mobile homes which are the subject matter of the summary suit we are now reviewing.

Oscar Curtis testified that the M.C.O.'s for the nine mobile homes that were held in the steel box in his home, occupied, with respect to the outstanding loans of $97,164.61, the exact same position as of the date of bankruptcy as the floor planned units had originally. The Referee stated in his Memorandum Opinion:

"If Oscar Curtis is to be believed, the nine mobile homes are replacements for the floor planned mobile homes, and with respect to the outstanding loans of $97,164.61 the nine occupied the exact same position as of the date of bankruptcy as the floor planned units had originally. At least this would be the apparent result of substitutions he claims to have made in the M.C.O.'s held in the steel box in his home. Curtis testified that at the times the floor planned units were sold or otherwise disposed of, instead of repaying existing loans from the proceeds and causing new loans to be made against other units, he simply substituted the other M.C.O.'s in place of the floor planned M.C.O.'s in the steel box, and when the other units were sold or disposed of, he substituted still other M.C.O.'s in the steel box, and so on, until ultimately at bankruptcy, he had the nine M.C.O.'s in the box. As he tells it, all substitu-

tions were simultaneous, on a 'dollar for dollar' or better basis, and presumably within the scope of his dual authority."

Several issues have been raised by Lyle and Phyllis Neff in the Petition for Review. In a thoroughly considered and well reasoned Memorandum Referee Strasheim held against the Neffs on all issues they raised.

The petitioners contend . that the Bankruptcy Court never acquired jurisdiction over the subject matter of this action.

█ The Bankruptcy Court obviously has jurisdiction of the matter. The mobile homes in question were located on North American's property at the time of the bankruptcy and the Receiver, Fay Pollack, immediately took possession of said homes. This possession is sufficient to confer jurisdiction upon the Court. Isaacs v. Hobbs Tie & Lumber Co., 282 U.S. 734, 51 S.Ct. 270, 75 L.Ed. 645 [1931]; Thompson v. Magnolia Petroleum Co., 309 U.S. 478, 60 S.Ct. 628, 84 L.Ed. 876 [1948].

█ In accordance with § 70c subsection [3] of the Bankruptcy Act, Pollock, the Trustee of the bankrupt estate, had at the time of the bankruptcy the status of an ideal lien creditor in regard to the nine mobile homes. Lewis v. Manufacturer's National Bank, 364 U.S. 603, 81 S.Ct. 347, 5 L.Ed.2d 323 [1961]. In accordance with the Nebraska Uniform Commercial Code, § 9–301 [1] Pollock, as Trustee, would be entitled to the nine mobile homes unless the Neffs had a perfected security interest. In Nebraska, such perfection in mobile homes must be done in accordance with R.R.S. 1943, § 60–110. That section provides in part:

"60–110. . * * * Any mortgage, conveyance intended to operate as a mortgage, trust receipt, conditional sales contract or other similar instrument covering a motor vehicle, if such instrument is accompanied by delivery of such manufacturer's or importer's certificate and followed by actual and

continued possession of same by the holder of said instrument * * * shall be valid as against the creditors of the mortgagor, whether armed with process or not, and subsequent purchasers, mortgagees and other lienholders or claimants but otherwise shall not be valid against them. * * * "

In accordance with the statute, the term "motor vehicle" includes mobile homes. See R.R.S. § 60–102.

Accordingly, in order for the Neffs to have a perfected security interest in the nine mobile homes it is incumbent that they had possession of the nine M.C.O.'s on the date of bankruptcy. The Referee held that the Neffs did not have possession. The Court agrees.

The issue is clear: can the debtor of a secured party qualify as agent for the secured party in the capacity of the possessor of the property in which the secured interest is claimed.

The Nebraska Supreme Court has never announced what constitutes possession within the meaning of R.R.S.1943, § 60–110. In the Code, which, as previously pointed out, is not controlling here, it is stated that: "Possession may be by the secured party himself or by an agent on his behalf: it is of course clear, however, that the debtor or a person controlled by him cannot qualify as such agent for the secured party." Comment 2 Neb.U.S.C. § 9–305.

Further excellent support for the Referee's finding regarding the definition of possession is found in Professor Gilmore's work, Security Interests in Personal Property, Vol. 1, § 142, p. 440 [1965]. Therein it is stated:

"What is 'possession'? Possession is a simple concept. The pledgee can hold the property himself or through an agent. *The agent cannot, however, be either the debtor-pledgor or anyone under his control, since the basic pledge idea is that the pledgor must not be able to pass off the goods as his own.* A number of old cases show experimentation with the idea of mak-

ing the pledgor agent for the pledgee —for example, by having the pledgor issue warehouse receipts for goods in his factory or storehouse—but at this point the courts have held the line; *it has been frozen law for fifty years that the possession which perfects a pledge is that of the pledgee himself or of some third party who is independent of the pledgor.*" [Emphasis added.]

Pertinent here also is the language from Robertson v. Wade, 17 Tenn.App. 457, 68 S.W.2d 487 [S.C.Tenn.1933] where it was said:

"Ordinarily, delivery of possession is essential to the validity of a pledge. 49 C.J. 910–918; Eason v. Gibbs, 1 Tenn.App. 523; Johnson v. Smith, 11 Humph. 396; Wharton v. Lavender, 14 Lea. 178, 188; National Bank v. Winston, 5 Baxt. 685; Hurst v. Jones, 10 Lea. 8, 14; Nashville Trust Co. v. First National Bank, 123 Tenn. 617, 627, 134 S.W. 311. And even a pledge is not valid where the pledgor is left in possession of the property as agent of the pledgee. 49 C.J. 915, 917, § 43". Id. at page 493.

The Court specifically holds that Oscar Curtis could not act as agent of the Neff Trust and accordingly the Trust created by the Neffs did not have possession of the mobile homes in question and thus were without security interest in the mobile homes in question.

The Referee also found for the basis of his decision the failure of the Neffs to carry the burden of proof as to their possession of the M.C.O.'s in question. The Referee stated in his Memorandum that he did not believe Oscar Curtis' testimony regarding his possession of the M.C.O.'s as agent of the Neff Trust. Part of the basis of the Referee's finding was certain factual inconsistencies regarding the M.C.O.'s.

Because of the Court's finding that Oscar Curtis could not possess the M.C.O.'s as agent of the Neffs, no finding regarding the testimony of Oscar Curtis will be made, and also there is no need

to consider the motion of the Neffs to remand the case back to the Referee for the taking of additional evidence, for the attorney for the Neffs stated that the additional evidence would only concern itself with support of the testimony of Mr. Oscar Curtis.

In accordance with this Memorandum an Order will be entered this same date.