In re Peter KONTARATOS, Valerie Kontaratos, Debtors.

Roger P. HALE, Plaintiff,

v.

Peter KONTARATOS, Valerie Kontaratos, Defendants.

Bankruptcy Nos. 180–00189, 180–00190. Adv. No. 180–0077.

United States Bankruptcy Court, D. Maine.

May 8, 1981.

Louis H. Kornreich, Goodman, Goodman & Kornreich, Bangor, Me., for debtors.

George Burns, Daniel Amory, Drummons, Woodsum, Plimpton & MacMahon, Portland, Me., for Roger Hale.

## MEMORANDUM DECISION

CONRAD K. CYR, Bankruptcy Judge.

The intricacies of pertinent provisions of the Uniform Commercial Code necessitate a detailed statement of the operative facts underlying these adversary proceedings for relief from stay. The ensuing discussion deals with interesting and important issues of commercial law.

The defendants [debtors], husband and wife, entered into an agreement on June 18, 1979 for the purchase of all of the corporate stock of Casco Bay Lines, Inc. [CBL] with Donald F. Singer, Esquire, Executor of the Estate of Norman C. Thomas, and with James F. McLaughlin, trustee under a revocable living trust agreement with Peter T. McLaughlin, [sellers]. With the exception of a $50,000 deposit advanced by the debtors, the entire $359,750 purchase price was borrowed; $200,000 from Depositors Trust Company of Southern Maine [DTC] and the balance from the plaintiff [Hale]. The Hale loan closing took place on September 14, 1979. The DTC loan closing occurred later that day.

The debtors executed promissory notes in favor of Hale in the principal amounts of $40,000 [payable in seven days] and $80,000 [payable in ninety days], as well as stock pledge agreements, stock powers, a loan equity participation and work agreement, and a stock redemption agreement. At the time of the Hale loan closing, the debtors owned all of the stock of Sea Queen Kontaratos Lines, Ltd., Sea Queen III, Inc., and Offshore Maritime Service, Inc., which they pledged to Hale together with all issued and outstanding CBL stock, to be acquired later that day. The debtors further agreed, as additional consideration for the $110,000 loan, to pay or provide Hale: (a) 15% interest; (b) a $10,000 bonus [included in the $80,000 note]; (c) 20% of the stock of CBL; (d) an option in favor of Hale Sand & Gravel, a Hale proprietorship, to perform all CBL marine work; (e) 10% of the debtors' salaries from CBL; (f) 10% of debtors'

CBL dividends; (g) 10% of the stock of Sea Queen Kontaratos Lines, Ltd., Offshore Maritime Service, Inc., and Sea Queen III, Inc.; (h) 10% ownership in any company organized by the debtors whose assets include any vessel acquired from CBL, or 10% of the fair market value of any CBL vessel conveyed; and (i) payment of all expenses incurred by Hale for legal services in connection with the loan between August 7 and September 18, 1979, amounting to $10,007.88.

At the time of the closing of the CBL stock purchase, after the Hale loan closing on September 14, 1979, the debtors warranted to DTC, in consideration of the $200,000 loan, that they were the sole legal and beneficial owners of all CBL stock and that no encumbrances would be created without the prior written approval of DTC. Any misrepresentation or breach concerning the existence or creation of competing liens or claims of ownership was made an event of default. The debtors pledged to DTC all outstanding shares of stock of Sea Queen Kontaratos Lines, Ltd., Sea Queen III, Inc., Offshore Maritime Service, Inc., and CBL, and delivered the stock certificates to DTC upon their receipt from the sellers. DTC retains possession of the certificates.

The debtors satisfied the $40,000 note in full on September 24, 1979. During January, 1980, $2,000 was paid on the $80,000 note. At the commencement of these chapter 11 proceedings, Hale claimed a $96,348.47 balance, which was later increased to $126,843.80. On December 18, 1979 and after default, the debtors executed amended Hale loan documents, the principal effect of which was to reduce Hale's CBL stock ownership to ten percent.

On January 2, 1980, Hale caused a financing statement signed by him, for himself and the debtors, to be filed with the Secretary of State, describing the collateral as follows:

This financing statement evidences the existence of a pledge and all rights, interest, and equity in all of the outstanding common stock of Casco Bay Lines, Sea

Queen III, Inc., Sea Queen Kontaratos Lines, Ltd., and Offshore Maritime Service, Inc. under agreements dated in September, 1979 under which debtors pledged all of the stock to secure a promissory note and work agreement of even date.

On the same day, Hale served the debtors with a written notice of default for failure to satisfy their note on or before December 15, 1979, simultaneously notifying the debtors of Hale's intention to redeem the pledged stock certificates from DTC.

On January 9, 1980, an attorney representing Hale notified counsel for DTC of the stock pledge and related agreements between Hale and the debtors, and of Hale's intention to redeem the stock from DTC. Copies of the relevant Hale loan documents were enclosed. On January 18, 1980, Hale wrote the president of DTC demanding the right of redemption. DTC refused to permit Hale to redeem. On or about February 4, 1980, Hale filed a complaint against the debtors and DTC in the Maine Superior Court for specific performance, declaratory and injunctive relief, and damages. The debtors filed voluntary chapter 11 petitions on June 13, 1980. Hale commenced these adversary proceedings for relief from stay on August 4, 1980.

The gravamen of the action presently before the court concerns the perfection of a security interest in personal property of the defendants. Article 9, Uniform Commercial Code—Secured Transactions,[1] points the way to perfection. UCC § 9-102(1)(a) & (2).

UCC § 9-203[2] prescribes certain requisites of an enforceable security interest; *inter alia*, that the security interest attach.[3] UCC § 9-203(1). A security interest does not attach until there is agreement, value is given and *the debtor acquires rights in the collateral*.[4] Hale gave value and was granted a security interest in the CBL stock prior to the delivery of the stock certificates to the debtors later that day. It remains to be determined when the debtors acquired rights in the collateral.

The time of acquisition of rights in collateral is dependent upon the type of collateral.[5] The CBL stock certificates were issued in registered form, within the meaning of UCC § 8-102(1)(a)(i) & (c), are of a class or series of instruments, *id.* § 8-102(1)(a)(iii), and evidence a share or interest in Casco Bay Lines, Inc., as required by UCC § 8-102(1)(a)(iv). CBL stock would rather clearly appear to qualify as "investment securities"[6] subject to Article 8, Uniform Commercial Code—Investment Securities,[7] *see* UCC § 8-102(1)(b), were it not for the fact that the Maine Supreme Judicial Court has held that shares of stock in a small, closely-held, family corporation are not "investment securities," within the meaning of UCC § 8-102(1)(a)(ii), because not of the type "commonly dealt in upon securities exchanges or markets, nor commonly recognized in area securities exchanges or markets as a medium for investment."[8] The

**1.** Me.Rev.Stat.Ann. tit. 11, § 9-101 [hereinafter cited: UCC § ———].

**2.** Me.Rev.Stat.Ann. tit. 11, § 9-203 (Supp. 1980-81) [hereinafter cited: UCC § ——— (Supp.1980-81)].

**3.** Defendants are chapter 11 debtors in possession in relation to whom plaintiff must demonstrate that the security interest is enforceable against third parties. *See* Bankruptcy Code §§ 103(a), 544(a) & 1107(a), 11 U.S.C. §§ 103(a), 544(a) & 1107(a) (1979). *See also* UCC § 9-301, (Supp. 1980-81). *Cf. In re Copeland*, 531 F.2d 1195, 18 UCC Rep. 833 (3d Cir. 1976) [Chapter XI debtor in possession has *ideal* lien creditor rights of trustee in bankruptcy]. *See* UCC § 8-317.

**4.** UCC § 9-203(1) & (2) (Supp. 1980-81).

**5.** *See, e. g.*, UCC §§ 2-327, 2-401(1) & 8-301.

**6.** *See id.* § 8-102.

**7.** *See Fidelity Bank & Trust Co. of New Jersey v. Production Metals Corp.*, 366 F.Supp. 613, 14 UCC Rep. 219, 225 (E.D.Pa.1973); *In re Milam*, 4 B.R. 621, 29 UCC Rep. 644 (Bkrtcy.M.D.Ga.B.J.1980); *In re Sportsland, Inc.*, 17 UCC Rep. 1333 (D.Mass.B.J.1975); *Lamb Bros., Inc. v. First State Bank of Oregon*, 285 Or. 39, 589 P.2d 1094, 26 UCC Rep. 1395, 1402, n. 2 (1979); *Kruse, Kruse & Miklosko, Inc. v. Beedy*, 353 N.E.2d 514, 20 UCC Rep. 217 (Ind.App.1976); *Gamble v. Hinds*, 10 Cal.App.3d 1021, 89 Cal. Rptr. 341, 8 UCC Rep. 3 (1970).

**8.** *Zamore v. Whitten*, Me., 395 A.2d 435, 441 (1978). *Cf. Silverman v. Alcoa Plaza Associates*, 37 A.D.2d 166, 323 N.Y.S.2d 39, 43 (1971) [cooperative apartment stock not "investment securities"].

*Zamore* rule does not quite reach regulated public utilities of substantial (if precarious) proportions whose stock is not family owned. There is no evidence that CBL was family owned before its acquisition by the debtors. Therefore, CBL stock constituted "investment securities" immediately prior to its delivery to the debtors. Did it become *something else upon delivery to the debtors?*

Compelling policy considerations militate against extension of the *Zamore* rule.[9] Simplicity,[10] clarity [11] and ·uniformity [12] in the law governing commercial transactions

---

9. *See, e. g.*, UCC § 1–102(1), (2)(a) & (c).

10. The difficulties inherent in the application of the *Zamore* rule are well exemplified in the present context. In the hands of James F. McLaughlin and the Estate of Norman C. Thomas, CBL stock constituted "investment securities". Upon delivery to the debtors, husband and wife, did it transmogrify into something else? *Zamore* demonstrates the difficulties involved in settling upon some satisfactory alternative collateral classification. *See* 395 A.2d at 441–43. *See also* notes 11 & 12 *infra.* Finally, is it the classification given the collateral in the hands of the debtor or in the hands of the debtor's transferor that governs the selection of rules for determining when and what rights were acquired by the debtor in the collateral for purposes of UCC § 9–203(1) & (2)?

11. What type of collateral is certificated corporate stock if not "investment securities"? If "goods" within the meaning of UCC § 2–105(1), as *Zamore* assumes without deciding, 395 A.2d at 443, is certificated stock "goods" within the meaning of Article 9? *See* UCC § 9–105(1)(h) (Supp. 1980–81). If "goods" for Article 9 purposes is certificated stock "consumer goods," "farm products," or "inventory"? If not, can it be seriously supposed that it was intended that corporate stock be considered "equipment"? See UCC § 9–109(2).

If not "goods" for Article 9 purposes and not "investment securities," certificated stock would appear to satisfy UCC § 9–105(1)(i), defining an "instrument," *inter alia,* as "any other writing which evidences a right to the payment of money ... of a type which is in ordinary course of business transferred by delivery with any necessary indorsement or assignment...." UCC § 9–105(1)(i) (Supp. 1980–81). *See* 13–A Me.Rev.Stat.Ann. §§ 511, 513(1), (2), 514 & 519. Certificated stock has never been classified as anything other than "instruments" for Article 9 purposes. *See* note 7 *supra.* The handful of decisions treating certificated stock in certain kinds of corporations as something other than "securities" did not present Article 9 collateral classification questions. *See Zamore v. Whitten*, Me., 395 A.2d 435 (1978) [close family corporation]; *Silverman v. Alcoa Plaza Associates*, 37 A.D.2d 166, 323 N.Y.S.2d 39 (1971) [cooperative apartment stock]; *Gulf Mortgage & Realty Investments v. Alten*, —— Pa.Super. ——, 422 A.2d 1090, 30 UCC Rep. 311 (Pa.Sup.1980) [professional corporation].

Unless a certificated stock is an "instrument," within the meaning of UCC § 9–105(1)(i), all courts and commentators are astonishingly wide of the mark. *See, e. g.*, note 7 *supra.* Certificated stock by definition cannot be an "investment security" unless it is an "instrument". *See* UCC § 8–102(1)(a). While a "security" is an "instrument" by definition under UCC § 9–105(1)(i), only an "instrument" satisfying the requirements of UCC § 8–102(1) is a "security". An "investment security" is a "negotiable instrument." UCC § 8–105(1). *See* Coogan, *Security Interests in Investment Securities Under Revised Article 8 of the Uniform Commercial Code*, 92 Harv.L.Rev. 1013, 1015 n. 8 (1979). Completing the convolution, a "negotiable instrument" defined in UCC § 3–104 is an "instrument." UCC § 9–105(1)(i) (Supp. 1980–81).

Uncertificated corporate stock is not an "instrument," but a "general intangible". *Heinicke Instruments Co. v. Republic Corp.*, 543 F.2d 700, 702, 20 UCC Rep. 1 (9th Cir. 1976). *See* Coogan, *supra* at 1020 n. 30. A security interest in "general intangibles" may be perfected only by filing, UCC § 9–302(1), whereas a security interest in "instruments" may be perfected only by possession. UCC § 9–304(1) (Supp. 1980–81). "General intangibles" and "instruments" are excluded from the classification of "goods" for Article 9 purposes. UCC § 9–105(1)(h) (Supp. 1980–81). If certificated stock were to be classified a "general intangible," a security interest in it could not be perfected by possession under UCC § 9–305. The court has discovered no authority for the proposition that a security interest in certificated stock may be perfected (other than automatically) by any means *except possession.*

12. Research discloses no other jurisdiction in which the *Zamore* rule obtains. Decisions holding that the stock of cooperative or professional corporations does not constitute "investment securities" are inapposite, since the transferability of such stock is severely restricted as a rule. *See, e. g., Gulf Mortgage & Realty Investments v. Alten*, —— Pa.Super. ——, 422 A.2d 1090, 30 UCC Rep. 311 (Pa.Sup.1980) [shares in professional corporation]. *Cf. Silverman v. Alcoa Plaza Associates*, 37 A.D.2d 166, 323 N.Y.S.2d 39 (1971) [cooperative apartment stock constitutes "goods" within the meaning of Article 2, rather than "realty"].

are not promoted by a rule dictating different collateral classifications on the basis of the presence or absence of a family relationship among stockholders. The Uniform Commercial Code implies no such distinctions. It classifies certain *types* of instruments as "investment securities," [13] without regard to the identity of the holders,[14] and without reference to the size or function of the enterprise.[15]

The certificated CBL stock constituted "investment securities" in the hands of James F. McLaughlin and the Estate of Norman C. Thomas, and remained "investment securities" upon delivery to the debtors. Article 8 governs the determination as to when and what rights were acquired by the debtors in the CBL stock.

The debtors acquired the rights of their transferors in the CBL stock, upon its delivery. UCC § 8–301(1). Delivery occurred during the DTC loan closing, following the Hale closing. UCC § 8–313(1)(a). The debtors then acquired ownership rights in the CBL stock, enabling the security interests of Hale and DTC to attach at that time or as soon thereafter as there was agreement and value was given. UCC § 9–203(2).[16]

Hale also asserts a security interest in the common stock of Sea Queen Kontaratos Lines, Ltd., Sea Queen III, Inc., and Off-shore Maritime Service, Inc. owned by the debtors at and before the Hale closing. Is the certificated stock of these closely-held, family corporations to be considered "investment securities"?

The record evidences that Hale recognized the stock of these three corporations as a medium for investment, but for which he would not have loaned the debtors the funds with which to finance the purchase of the CBL stock. As additional consideration for the loan, the debtors agreed to convey ten percent of the common stock in each of these three corporations to Hale.[17] There is no evidence that the stock of these corporations is not of a *type* commonly recognized as a medium for investment.[18] Furthermore, the agreement whereby Hale, a stranger, would become the owner of ten percent of the stock of these corporations vitally alters the nature of these entities as family corporations. As a general rule and absent countervailing evidence, proof that a stranger acquires common stock in a closely-held corporation by purchase should presumptively satisfy UCC § 8–102(1)(a)(ii). I conclude that the certificated stock of these three corporations constituted "investment securities" in the hands of the debtors.

The debtors having owned the stock at and before the Hale closing, the Hale secur-

**13.** *See* UCC § 8–102(1)(a)(ii).

**14.** *See id.* § 8–102(1).

**15.** *See id.* § 8–102(1)(a)(iv).

**16.** UCC § 9–203(2) (Supp. 1980–81).

UCC § 9–203(2) deems attachment to have occurred as soon as all three of the events specified in UCC § 9–203(1) have taken place, unless there is "explicit agreement" that the time of attachment be postponed. *See, e. g., In re Copeland*, 531 F.2d 1195 (3d Cir. 1976); *In re Dolly Madison Industries, Inc.*, 351 F.Supp. 1038 (E.D.Pa.1972), *aff'd per curiam* 480 F.2d 917 (3d Cir. 1973). *See generally* 1A Coogan, Hogan & Vagts, Secured Transactions, § 6C.08[1][d], at pp. 6C–131—6C–132 (Matthew Bender 1980 ed.) [hereinafter cited: 1A Coogan § 6C–08[ ], at ——].

There is evidence that Hale had notice of an agreement between DTC and the debtors prohibiting competing lien and ownership claims in the collateral absent the permission of DTC, no such permission having been granted.

There is evidence that Hale did not seek priority over the security interest of DTC. The record supports a finding that there was a tacit understanding that the Hale security interest was to remain subordinate to the DTC security interest, and that its perfection was to be postponed to that end, *cf. Allegaert v. Chemical Bank*, 29 UCC Rep. 993, 1003 (2d Cir. 1980) [unequivocal proof of explicit agreement essential to postpone attachment], *rev'g* 454 F.Supp. 341 (E.D.N.Y.1978), but there is no evidence of an agreement, tacit or otherwise, postponing *attachment* of the Hale security interest.

**17.** The original loan documents grant Hale twenty percent of the stock of CBL. Hale claims only ten percent on the ground that the larger figure was inserted in error.

**18.** In *Zamore* the record was silent as to such matters. 395 A.2d at 441.

ity interest attached at the time of the Hale closing, prior to the DTC closing. UCC § 9–203(1) & (2).[19] When did the Hale security interest become perfected?

■ As at the outset, the path to perfection is described in Article 9. UCC § 9–102(1)(a).[20] A security interest is perfected when all applicable steps required for perfection have been taken. UCC § 9–303(1). The Hale security interest became automatically perfected for a period of twenty one days, without possession. UCC § 9–304(4). A security interest in instruments [21] may not be perfected by filing, but must be perfected by possession.[22] The financing statement filed by Hale on January 2, 1980 was a nullity by reason of the requirement of UCC § 9–304(1) that perfection be by possession, as well as the fact that the financing statement was insufficient because not signed by the debtors but by Hale in their behalf.[23]

■ The record reflects that DTC acquired a security interest in the stock of these three corporations immediately after the Hale closing. The debtors delivered the stock certificates in registered form [24] at the DTC closing and DTC has retained possession.[25] The Hale security interest, in these stocks was perfected first,[26] but became subordinate to the DTC security interest within a matter of hours when DTC became a bona fide purchaser [27] of the securities, within the meaning of UCC § 9–309,[28] which grants a bona fide purchaser of investment securities priority over an earlier perfected security interest.

■ The DTC security interest in CBL stock enjoys priority over the Hale security interest as well. Their security interests attached simultaneously at the time of the DTC closing the instant delivery of the stock certificates was made to the debtors. UCC §§ 9–203(1)(c), (2), 8–301 & 8–313(1)(a). DTC simultaneously obtained physical possession of the stock certificates, thereby perfecting its security interest. UCC § 9–305. DTC became a bona fide purchaser [29] of the CBL stock with priority over the simultaneously perfected [30] Hale security interest. UCC § 9–309.[31]

The Hale claim to ownership of ten percent of the stock of these four corporations cannot be successfully asserted against DTC. As a bona fide purchaser,[32] DTC takes free of any adverse claim of Hale, including ownership claims. UCC § 8–301(2).[33] Can Hale claim title against the *debtors in possession?*

■ UCC § 8–301(1) provides that a purchaser acquires the rights in a security which his transferor had, "upon delivery." "Delivery" means "voluntary transfer of possession." UCC § 1–201(14). Delivery is complete when certain prescribed events have taken place. *See* UCC § 8–313(1). Hale did not personally receive the stock

19. UCC § 9–203(1) & (2) (Supp. 1980–81).

20. *Id.* § 9–102(1)(a).

21. *See id.* § 9–105(1)(i).

22. *Id.* §§ 9–302(1)(a), (b) & 9–304(1).

23. *Id.* § 9–402(1). *Cf. Maine League Federal Credit Union v. Atlantic Motors,* Me., 250 A.2d 497 (1969) [not signed by secured party].

24. UCC § 8–102(1)(c).

25. UCC § 9–305 (Supp. 1980–81).

26. *Id.* § 9–304(4).

27. "A bona fide purchaser is a purchaser for value in good faith and without notice of any adverse claim who takes delivery of a security ... in registered form issued to him or indorsed to him in blank." UCC § 8–302.

DTC purchased [UCC § 1–201(32) & (33)] a security interest in the stock of these corpora-

tions for value [UCC § 1–201(44)(d)] in good faith [UCC § 1–201(19)] and without notice [UCC § 1–201(25)] of the adverse claim [UCC § 8–301(2) (Supp. 1980–81)] of Hale. The stock certificates were delivered [UCC § 1–201(14)] to DTC by the debtors in registered form [UCC § 8–102(1)(c)] indorsed [UCC § 8–308(1)] to DTC.

28. UCC § 9–309 (Supp. 1980–81).

29. *See* note 27 *supra.*

30. *See* UCC § 9–304(4).

31. UCC § 9–309 (Supp. 1980–81).

32. *See* UCC § 8–302. *See also* note 27 *supra.*

33. UCC § 8–301(2) (Supp. 1980–81). *See id.* § 8–301(1).

certificates, which were delivered instead to DTC. Hale maintains that DTC is "a person designated" by him to acquire possession of the certificates, as provided by UCC § 8–313(1)(a). There is no evidence that Hale actually designated DTC or anyone else to acquire possession in his behalf. DTC forbade the creation of competing security interests in these securities without its express permission. DTC has steadfastly refused to permit Hale to redeem the securities. Hale has even brought suit against DTC for redemption. These circumstances certainly do not evidence an implied designation of DTC under UCC § 8–313(1)(a). *Cf.* UCC § 8–301(1) [purchaser acquires rights transferor had actual authority to convey].

UCC § 8–313(1)(d) [34] avails Hale nothing. DTC has never acknowledged that it holds the securities for Hale.

■ There having been no delivery, Hale acquired no title to the securities. Title remained in the debtors and now resides in their chapter 11 estate, subject to enforceable liens. *See* Bankruptcy Code §§ 103(a) & 541(a)(1), 11 U.S.C. §§ 103(a) & 541(a)(1).

Hale did nonetheless acquire a security interest in these securities, although the transfer of possession necessary to enable him to acquire ownership was not accomplished. Article 9, rather than Article 8, governs the creation of a security interest in investment securities.[35] UCC § 9–203(1) & (2) [36] prescribe the essential elements of

an enforceable security interest in investment securities, only one of which contemplates reference to Article 8—acquisition by the *debtor* of rights in the collateral.[37]

The debtors in possession challenge the Hale security interest in these investment securities on the ground that it is unperfected,[38] while Hale insists that the security interest was perfected under UCC § 9–305.[39]

§ 9–305. *When possession by secured party perfects security interest without filing*

A security interest in letters of credit and advices of credit (section 5–116, subsection (2), paragraph (a)), *goods, instruments,* money, negotiable documents or chattel paper may be perfected by the secured party's taking possession of the collateral. *If such collateral other than goods covered by a negotiable document is held by a bailee, the secured party is deemed to have possession from the time the bailee receives notification of the secured party's interest.* A security interest is perfected by possession from the time possession is taken without relation back and continues only so long as possession is retained, unless otherwise specified in this Article. The security interest may be otherwise perfected as provided in this Article before or after the period of possession by the secured party.[40]

Hale suggests that the collateral constitutes either "goods" or "instruments" and that

---

**34.** UCC § 8–313(1)(d) (Supp. 1980–81). UCC § 8–313(1)(d) reads:

 (1) Delivery to a purchaser occurs when

 . . . .

 (d) With respect to an identified security to be delivered while still in the possession of a third person *when that person acknowledges that he holds for the purchaser.* . . .
(Emphasis added.) *See* UCC § 8–313(d), UCC Comment 2.

**35.** *See* Coogan, *Security Interests In Investment Securities Under Revised Article 8 of the Uniform Commercial Code,* 92 Harv.L.Rev. 1013, 1052–53 (1979), for an excellent discussion of the interrelationship between Article 8 and Article 9.

**36.** UCC § 9–203(1) & (2) (Supp. 1980–81).

**37.** *See id.* § 9–203(1)(c).

**38.** *See* UCC § 9–301(1)(a) & (b) (Supp. 1980–81); Bankruptcy Code §§ 103(a), 544(a) & 1107(a), 11 U.S.C. §§ 103(a), 544(a) & 1107(a) (1979).

**39.** UCC § 9–305 (Supp. 1980–81).

**40.** *Id.* (Emphasis added.)

 The second sentence of UCC § 9–305 appears to have been cloned nonverbatim from section 8 of the Restatement of Security.

 Where the chattel is in the possession of a third person a pledge may be created by assent of the pledgor and notification by either pledgor or pledgee, to the third person, that the chattel has been pledged to the pledgee.
Restatement of Security, § 8.

his security interest became perfected on or about January 9, 1980 when counsel for Hale wrote DTC counsel as follows:

> Enclosed is a copy of the Promissory Note Stock Pledge Agreement and some of the related stock powers which we discussed yesterday. Also enclosed is a copy of the Notice of Default and my letter to Marco DeSalle [President of Depositors Trust Company of Southern Maine]. We want to take the stock out of the pledge with Depositors immediately. Please tell us what we have to do to redeem in accordance with the Code. I am not asking for legal advice, on the contrary what I want are the bank's conditions. We have to know these in order to tender performance especially since we have not seen the bank's documents relating to its loan to Mr. Kontaratos.[41]

Enclosed was a copy of the $80,000 promissory note, the Hale stock pledge agreement, and related stock powers. On January 18, 1980, Hale wrote the President of DTC as follows:

> I am informed that you will not permit me to redeem the stock presently in your possession which is owned by Mr. and Mrs. Kontaratos. I am also told that you will not permit me to purchase the Promissory Note which is presently outstanding with respect to these people. Please be advised that your failure to allow me to redeem the collateral and exercise my self-help remedies has damaged me greatly. The value of my security is in jeopardy and I will look to you for any and all damages and consequences which may arise out of this.
>
> If I do not hear from you in writing that the facts stated in this letter are not true, I will have no recourse but to initiate litigation on the first business day after you receive this letter.[42]

On or about February 4, 1980, Hale filed suit against DTC in the Maine Superior Court for specific performance, declaratory and injunctive relief, and damages. The complaint refers to the stock pledge agreement between the debtors and Hale as pledging all of the debtors' interest in the common stock of all four corporations as "security for the [$80,000] promissory note." The complaint was duly served on DTC.

In search of an understanding of UCC § 9–305 it becomes necessary first to risk further confusion exploring its origins. The Official Uniform Commercial Code Comment to UCC § 9–305 reflects and precipitates some of the confusion soon to become apparent.

> Possession may be by the secured party himself or by an agent on his behalf: it is of course clear, however, that the debtor or a person controlled by him cannot qualify as such an agent for the secured party. See also the last sentence of Section 9–205. Where the collateral (except for goods covered by a negotiable document) is held by a bailee, the time of perfection of the security interest, under the second sentence of the Section, is when the bailee receives notification of the secured party's interest: this rule rejects the common law doctrine that it is necessary for the bailee to attorn to the secured party or acknowledge that he now holds on his behalf.[43]

Except for the definition of "bailee" appearing in Article 7, Uniform Commercial Code—Documents of Title,[44] which is not made applicable to Article 9,[45] the critically important terms "bailee" and "possession" are nowhere defined under the Code. Highly respected authority states that a pledgee in possession may be a bailee for UCC § 9–305 purposes,[46] though no report-

---

41. *See* Plaintiff's Exhibit # 34.

42. *See* Plaintiff's Exhibit # 35.

43. UCC § 9–305, Official Comment 2.

44. *See* UCC § 7–102(1)(a). The definitions of section 7–102 are expressly made applicable to Article 7. UCC § 7–102(1). *See also,* UCC § 8–313(1)(d), (Supp. 1980–81).

45. UCC § 7–102(1). *See* 1A Coogan § 6C.08[1], at pp. 6C–126—6C–128.

46. *See* 1 Gilmore, Security Interests in Personal Property, § 14.2, at 440 (1965) [otherwise cited:

ed decision has ever done so.[47] Several decisions uphold the perfection of security interests in instruments in the possession of an escrow agent designated by the debtor and the secured party.[48]

■ Official Comment 2 explains that UCC § 9–305 "rejects the common law doctrine that it is necessary for the bailee to attorn to the secured party or acknowledge that he now holds on his behalf,"[49] a conclusion that appears to proceed from the second sentence of UCC § 9–305, viz., "the secured party is deemed to have possession from the time the bailee receives notification of the secured party's interest."[50] Professor Gilmore is of the view that "perfection occurs when the third person receives notification, from either pledgor or pledgee, of the pledgee's interest; some of the older cases suggest that there must also be an acknowledgment or attornment by the third person to the pledgee, but modern authority holds that the notification is all that is required."[51]

Gilmore § ——]; 1 Coogan § 4.08[1], at 314.10, 314.11.

47. An unpublished Second Circuit decision invalidates a junior security interest in securities in the possession of a senior pledgee unwilling to act as bailee. *See Winnett v. Inverness, Inc.,* —— F.2d —— (2d Cir. 1979). *Cf. Gins v. Mauser Plumbing Supply Co.,* 148 F.2d 974 (2d Cir. 1945), *rev'g.* 53 F.Supp. 151 (S.D.N.Y.1943). [Where pledgee in possession acknowledges and accepts instructions of *pledgor* to deliver collateral, after performance, to secondary pledgee, secondary pledge is enforceable against trustee in bankruptcy of pledgor.]

48. *E. g., In re Copeland,* 531 F.2d 1195, 18 UCC Rep. 833 (3d Cir. 1976), *aff'g.* 391 F.Supp. 134, 16 UCC Rep. 273 (D.Del.1975); *Kruse, Kruse & Miklosko, Inc. v. Beedy,* 353 N.E.2d 514, 20 UCC Rep. 217 (Ind.App.1976); *Estate of Hinds,* 8 UCC Rep. 3, 7 (Ct.App.Cal.1970). *In re Barney,* 344 F.Supp. 694, 696, 11 UCC Rep. 853, 856 (D.Idaho 1972). *Cf. Smith v. Dean Vincent, Inc.,* 47 Or.App. 887, 615 P.2d 1097, 29 UCC Rep. 1662–68 (1980) [escrow agent liable in damages for wrongful delivery of collateral to debtor]; *In re Miller,* 545 F.2d 916, 20 UCC Rep. 1314, 1319 (5th Cir. 1977) [consignor of goods § 9–305 bailee]; *In re Burnett,* 21 UCC Rep. 1471, 1473 (D.R.I.B.J.1977) [employee of secured party § 9–305 bailee of goods]. *Contra, Stein v. Rand Construction Co., Inc.,* 400 F.Supp. 944, 16 UCC Rep. 1150, 1154 (S.D.N.Y. 1975). *Cf. Heinicke Instruments Co. v. Republic Corp.,* 543 F.2d 700, 20 UCC Rep. 1 (9th Cir. 1976), *rev'g. Heinicke Instruments v. Block,* 14 UCC Rep. 167 (D.Or.1974) [issuer not § 9–305 bailee of stock certificates]; *In re Dolly Madison Industries, Inc.,* 351 F.Supp. 1038, 1042, 11 UCC Rep. 926, 931 (E.D.Pa.1972), *aff'd per curiam* 480 F.2d 917 (3d Cir. 1973) [possession of escrow agent "neutral"]; *In re Bruce Farley Corp.,* 612 F.2d 1197, 3 B.R. 77, 28 UCC Rep. 240 (9th Cir. 1980); *In re Staff Mortgage & Investment Corp.,* 550 F.2d 1228, 21 UCC Rep. 887 (9th Cir. 1977) [no § 9–305 bailment of instruments in possession of debtor for collection]; *In re North American Builders, Inc.,* 320 F.Supp. 1229, 1232, 8 UCC Rep. 1132, 1135 (D.Neb.1970) [debtor not § 9–305 bailee of goods]; *In re Milam,* 4 B.R. 621, 29 UCC Rep.

644, 646 (Bkrtcy.M.D.Ga.B.J.1980) [issuer not § 9–305 bailee of stock certificates]; *In re North Broadway Funding Corp.,* 6 B.R. 133, 2 C.B.C. 354 (Bkrtcy.E.D.N.Y.B.J.1979) [counsel to debtor not competent § 9–05 bailee]; *In re Black Watch Farms, Inc.,* 9 UCC Rep. 151, 155 (S.D.N.Y.B.J.1971) [debtor not § 9–305 bailee of goods]. *See* 1A Coogan § 6C.08[1][d], at 6C–131, n. 366 (Supp. 1980).

49. UCC § 9–305, Official Comment 2. *But cf.* UCC §§ 8–301(1) & 8–313(1)(d).

50. UCC § 9–305 (Supp. 1980–81). *See* note 40 *supra.*

51. Gilmore § 14.2, at 440 (footnote omitted). Professor Gilmore cites three pre-Code cases in support of the suggestion that modern authority holds that notification is all that is required. These cases did not deal with the perfection and enforceability of a junior nonpossessory pledge as against lien creditors, but with its validity vis-a-vis. the pledgor. *See Schram v. Sage,* 46 F.Supp. 381, 383 (E.D.Mich. 1942); *Robinson v. Exchange National Bank of Tulsa,* 31 F.Supp. 350, 351 (N.D.Okl.1940). *Cf. Pierce v. National Bank of Commerce of St. Louis,* 268 F. 487 (8th Cir. 1920) [interpleader brought against pledgor and junior pledgee by senior pledgee in possession upon performance by senior pledgee]. *See also Casey v. Cavorac,* 96 U.S. 467, 24 L.Ed. 779 (1867). *Cf.* Gilmore § 1.4, at 17–20 [Under Uniform Warehouse Receipts Act § 42, transferor of non-negotiable document of title has rights only against transferor prior to notification; after notification, the pledge is invulnerable.] *See also id.* § 14.2, at 441; Restatement of Security, § 8, Comment a; *id.* § 10(1).

Notification to a bailee must be considered sufficient to enable the enforcement of a nonpossessory pledge against the *pledgor,* since that is the most that can be managed when actual possession of the collateral is in a third person. *See Gins v. Mauser Plumbing Supply Co.,* 148 F.2d 974, 977–78 (2d Cir. 1945); *Pierce v. National Bank of Commerce of St. Louis,* 268 F. 487, 493 (8th Cir. 1920); *Schram v. Sage,* 46

Necessity must have motivated Section 8 of the Restatement of the Law of Security.

Where the chattel is in the possession of a third person a pledge may be *created* by assent of the pledgor and notification by either pledgor or pledgee, to the third person, that the chattel has been pledged to the pledgee.[52]

Another respected authority relies upon the *Restatement* in rejecting a previously-held view that only an Article 7 "professional" can qualify as a UCC § 9–305 bailee.[53] The Coogan treatise focuses on the possible involuntariness of the UCC § 9–305 bailment relationship, taking comfort from the fact that the drafters of the *Restatement* did not find onerous the imposition of a bailment upon a third person in possession of the collateral.[54]

While ordinarily an agency cannot be *created* without consent of the agent (Restatement of Agency, § 15) it is not considered desirable to require the consent of the third person as a condition precedent to the *creation* of the pledge. The third person's duties are not altered in any material respect by the pledge. To make the third person's consent a test of *the creation of the pledge* would invest him with an arbitrary power of affecting the interests of the other parties. The third person of course may surrender the possession if he does not wish to be under any duty to the pledgee.[55]

The drafters of the Restatement were well within their rights in refusing to permit a third person in possession of collateral to veto the *creation* of a secondary pledge. But that is not to say that a pledgee in possession of investment securities should be compelled, following performance by, and without the approval of, the pledgor, to hold or surrender possession of the collateral contrary to the terms of their pledge agreement, on mere notification by a secured party.[56]

The *Coogan* treatise concludes that it is "not necessary to apologize because 9–305 obligates the bailee to perform for another." [57] But this viewpoint, like that of the drafters of the *Restatement* itself, could not have been reached with the pledgee-bailee in mind. A pledgee-bailee cannot surrender possession of the collateral without relinquishing his own pledge, see UCC § 9–305, certainly no minor imposition. What is more, if a pledgee may be conscripted into service as a UCC § 9–305 bailee on mere notification by another pledgee, he may be

---

F.Supp. 381, 383 (E.D.Mich.1942); *Robinson v. Exchange National Bank of Tulsa*, 31 F.Supp. 350, 351 (N.D.Okl.1940). *But cf.* §§ 8–301(1) & 8–313(1)(d) [investment securities].

**52.** Restatement of Security, § 8 (emphasis added). *But cf.* UCC §§ 8–301(1) & 8–313(1)(d) [investment securities]. The Restatement may have prompted Professor Gilmore's observation that notification of the bailee may be accomplished by either the pledgor or the pledgee. *See* note 40 *supra* & text accompanying note 51 *supra.* But, as we shall see, the identity of the 'notice' giver may be pivotal to the public notice function of UCC § 9–305 when the collateral consists of investment securities in the possession of a pledgee-bailee. The cases discussed by Professor Gilmore deal with the creation of the pledge and its validity between the pledgor and pledgee. *See* note 51 *supra.* Section 8 of the Restatement of Security makes clear that a pledge is not *created* prior to notification to the bailee. Restatement of Security, § 8, Comment a. *But cf.* Restatement of Security, § 10 [equitable pledge interest created]. It is apparent that section 8 itself, the comments and the accompanying illustrations did not contemplate a secondary pledge of investment se-

curities. *See generally* Aronstein, Haydock & Scott, *Article 8 Is Ready*, 93 Harv.L.Rev. 889 (1980); Coogan, *Security Interests in Investment Securities Under Revised Article 8 of the Uniform Commercial Code*, 92 Harv.L.Rev. 1013 (1979).

**53.** 1A Coogan § 6C.08[1][b], at pp. 6C–126—6C–128.

**54.** *Id.* at 6C–127. *But cf.* UCC §§ 8–301(1) & 8–313(1)(d) [investment securities].

**55.** Restatement of Security, § 8, Comment a. (emphasis added).

**56.** *See, e. g., Jenkins v. National Village Bank of Bowdoinham*, 58 Me. 275, 278 (1870). *See also* Restatement of Security, §§ 22–24; *id.* § 22, Comment b. ["A conversion may be committed by . . . (f) misdelivering a chattel. . . ."]; Restatement of Torts, § 223(f). *Cf.* UCC §§ 8–301(1) & 8–313(1)(d) [investment securities].

**57.** 1A Coogan § 6C.08[1][b], at 6C–127 (footnote omitted).

drawn at great risk and expense into litigation to defend, against the pledgor and any number of pledgees, his own pledge as well as any surrender of possession to the pledgor or to another pledgee.[58] Perhaps in recognition of the onerousness of an involuntary UCC § 9–305 bailment, the *Coogan* treatise refrains from suggesting "that a bailee who positively refuses to act for anyone other than the debtor will be obligated to do so." [59]

There is virtually no dispute that "the debtor or a person controlled by him cannot qualify as such an agent for the secured party." [60] It is significant, therefore, that a good-faith [61] bailee selling, pledging or delivering investment securities "according to the instructions of his principal" (the pledgor) is not liable for conversion or any

breach of fiduciary capacity "although the principal (pledgor) had no right to dispose of them." UCC § 8–318. Where the pledgor has never notified, authorized or directed a pledgee in possession of securities to hold the collateral for another secured party, the requisite lack of control on the part of the pledgor is clearly lacking. Retention by the pledgor of control over the disposition of collateral by an amenable pledgee in possession following performance [62] would eviscerate the § 9–305 bailment of any notice-giving function.[63]

The Uniform Commercial Code does not define a bailment, except for Article 7 purposes not made applicable under Article 8 or Article 9. *See* 1A Coogan § 6C.08[1][b], at pp. 6C–125—6C–128. Recourse must be had to the common law in such circumstances.[64] At common law,

---

**58.** *Cf. Smith v. Dean Vincent, Inc.*, 47 Or.App. 887, 615 P.2d 1097, 29 UCC Rep. 1662 (1980) [bailee liable in damages for wrongful delivery of collateral to debtor]. *See* Restatement of Security, §§ 22–24; Restatement of Torts, § 223. *See also* UCC § 8–318.

 In addition to stripping UCC § 9–305 of any pretensions to public notice giving, the commercial mischief flowing from a policy which would impose upon a pledgee in possession the obligation to perform for the holder of a secondary pledge expressly prohibited under the first pledge agreement would greatly inhibit the utility of the primary pledge as a security device.

**59.** 1A Coogan § 6C.08[1][b], at 6C–127, n. 358a. *See* note 47 *supra.*

 The bailee need not, however, "attorn to the secured party or acknowledge that he now holds on his behalf." UCC § 9–305, Official Comment 2. Rather it is suggested that (1) no UCC § 9–305 bailment exists where the agreement between the pledgor and the pledgee in possession prohibits other encumbrances, and (2) the pledgee in possession cannot be cast in the role of UCC § 9–305 bailee absent a conforming adjustment of their agreement.

**60.** UCC § 9–305, Comment 2. *See, e. g., Miller v. Wells Fargo Bank International Corp.*, 540 F.2d 548, 563 (2d Cir. 1976), *aff'g.* 406 F.Supp. 452 (S.D.N.Y.1975); *Gins v. Mauser Plumbing Supply Co.*, 148 F.2d 974, 977–78 (2d Cir. 1945). *See also* cases cited at note 48 *supra*; 1A Coogan § 6C.08[1][c]; Gilmore § 14.2, at 440. *But cf. Manufacturers & Traders' National Bank of Buffalo v. Gilman*, 7 F.2d 94, 97 (1st Cir. 1925) [manager of debtor designated by pledgor and pledgee to hold collateral as bailee subject to order of pledgee]; *Stevan v. Union Trust Co. of District of Columbia*, 316 F.2d 687, 691 (D.C.

Cir.1963) [enforceable pledge where debtor is collection agent of secured party].

**61.** " 'Good faith' means honesty in fact in the conduct or transaction concerned." UCC § 1–201(19). It would not seem dishonest for an alleged bailee in the present circumstances, after performance by the pledgor, to return the securities to the pledgor as agreed. *Cf. Jenkins v. National Village Bank of Bowdoinham*, 58 Me. 275, 278 (1870) [bailee obligated to return pledged securities upon performance]. Not only would this minimize the risk and expense of litigation, *see* UCC § 8–318, but any damages for which the bailee might become liable would appear recoverable in an action against the pledgor for breach of the pledge agreement prohibiting competing pledges. *See also* Restatement of Security, § 25.

**62.** *See* note 61 *supra* & accompanying text. *Cf. Jenkins v. National Village Bank of Bowdoinham*, 58 Me. 275, 278 (1870) [bailee to return pledged securities upon payment of debt].

**63.** *See* 1A Coogan § 6C.08[1][a], at 6C–123—6C–125; Gilmore § 14.2, at 440; note 48 *supra. See also* UCC § 8–318. *Cf.* 1A Coogan § 6C.08[2], at 6C–132 *et seq.*

**64.** UCC § 1–103. *See, e. g., Blue Rock Industries v. Raymond International, Inc.*, Me., 325 A.2d 66, 77, n. 7, 15 UCC Rep. 328, 339, n.7 (1974); *In re Lufkin*, 15 UCC Rep. 708, 710 (D.Me.B.J.1974). *Cf. Leaderbrand v. Central State Bank of Wichita*, 202 Kan. 450, 450 P.2d 1, 6 UCC Rep. 172, 178 (1969) [common law principles governing principal and agent supplement Code].

"anyone receiving property of another in trust for some special object or purpose and contracting to conform to the object or purpose of the trust could qualify." *Id.* at p. 6C–126.[65] The *special object or purpose* for which a bailee is entrusted by a pledgor with possession of collateral depends upon the terms of *their* pledge agreement.[66] A secured party depending for the perfection of its security interest upon the possession of a UCC § 9–305 bailee must establish the existence of a bailment consistent therewith. A bailee-pledgee may not be compelled to elect between compliance and non-compliance with the terms of the pledge respecting redelivery of the collateral following performance.[67] Where the agreement between the pledgor and the pledgee-bailee expressly prohibits the creation of other encumbrances there is no evidence of a conformable UCC § 9–305 bailment and it would be unreasonable to imply one.[68]

UCC § 9–305, an Article 9 provision governing the *perfection* of security interests vis-a-vis third parties,[69] does not concern itself with bailment law. The fundamental focus of UCC § 9–305 is upon the lien notice opportunity with which possession of collateral provides third parties. It is therefore appropriate to pursue the present problem further with a view to attuning the construction of UCC § 9–305 to its underlying public notice function.

The ostensible ownership that goes with the possession of collateral may give rise to a 'false credit' in the debtor; whereas possession of the collateral by the secured party tends to prevent the appearance of unfettered dominion in the debtor.

The possession of a pledged chattel by an agent of a pledgee has, in general, the same legal consequences as possession by the pledgee personally. As stated in § 8, a pledge may be created although the chattel is in the possession of a third person. Once the pledge has been created, a pledgor in the capacity of agent of the pledgee, might hold possession for the pledgee were it not that in the dual status of owner and agent, the pledgor might find his interests in conflict with those of the pledgee, and might be put in a position where his possession is deceptive to those persons.... There is some danger that the pledgor may be accorded a false credit rating by his possession of the pledged chattels. Aside from the possible injury to persons who extend credit during such possession, existing creditors may be induced to neglect measures available for their protection, and judgment creditors, not having the status of purchasers for value, may be put to useless expense in the expectation of having recourse against the pledged chattels in the possession of the pledgor.[70]

Notice filing developed as a substitute for possession. Notice filing commonly provides a more meaningful safeguard against 'false credit' than does possession[71] and is a permissible means of perfecting a security interest in most types of collateral, except

**65.** *See Jenkins v. National Village Bank of Bowdoinham,* 58 Me. 275, 278 (1876); *Heinicke Instruments Co. v. Republic Corp.,* 543 F.2d 700, 704, 20 UCC Rep. 1, 5 (9th Cir. 1976), *rev'g. Heinicke Instruments Co. v. Block,* 14 UCC Rep. 167 (D.Or.1974). *See also* J. Story, Bailments; § 2 (1870); Restatement of Security, § 1, Comment f; Second Restatement of Agency, § 175(1).

**66.** *See Jenkins v. National Village Bank of Bowdoinham,* 58 Me. 275, 277–78 (1870). *See also* Restatement of Security, §§ 14, 22, 23 & 37.

The stock pledge agreement between the debtors and DTC [Defendant's Ex. # 4] renders the encumbrancing or other transfer of the securities an event of default. DTC agrees to discharge the pledge upon performance.

**67.** *See* note 66 *supra. See also* UCC § 9–305, Comment 2: "possession may be by the secured party himself or by *an agent* on his behalf...." (emphasis added).

**68.** *See* note 66 *supra.*

**69.** UCC § 9–305 is in Part 3 of Article 9— "Rights of Third Parties; Perfected and Unperfected Security Interests; Rules of Priority." *See* UCC §§ 9–301—9–318.

**70.** Restatement of Security, § 11, Comment 2.

**71.** *See* 1A Coogan, § 6C.08[2], at 6C–132; Coogan, *Security Interests in Investment Securities Under Revised Article 8 of the Uniform Commercial Code,* 92 Harv.L.Rev. 1013, 1056–58 (1979).

instruments (including certificated securities). UCC § 9–304(1). But for UCC § 9–305, secondary security interests in certificated securities could not be perfected.

UCC § 9–305 makes the receipt of "notification"[72] of the secured party's interest[73] by a "bailee" the critical event that triggers an *ipso facto* possession in the secured party. The *Coogan* treatise opines that perfection depends "not so much [on] possession in the secured party as lack of possession in the debtor...."[74] But if mere lack of possession in the debtor obviates the deceptive obviates the deceptive appearance of dominion on the part of the debtor, why does UCC § 9–305 specifically refer to a "bailee" or, for that matter, require "notification"?

The answer may lie in the limitations of language. "Possession" is not a defined term under the Uniform Commercial Code. Nevertheless, it is clear that "possession" does not invariably reveal the true state of the title in collateral, anymore than it is always well suited to its intended public notice function. Insofar as the "possession" of a third person fairly reflects absence of control in the debtor over encumbered collateral the UCC § 9–305 public notice function is well served, but in order faithfully to apply UCC § 9–305 in service of its public notice function "possession" must be construed to mean "control."

It is almost universally conceded that UCC § 9–305 is not satisfied where the bailee is under the control of the debtor.[75] The reason is obvious. Where the debtor controls the bailee, he controls the collateral notwithstanding its physical possession by the bailee. The *Coogan* treatise presupposes that the person in possession is not under the control of the debtor.[76] Any other interpretation would carry the treatise well wide of its mark in these circumstances, where control of the disposition of the collateral by the pledgee in possession after performance rests entirely with the debtor.[77]

"Notification" of the "bailee" *in se* affords no notice of the secured party's inter-

---

**72.** DTC received notification from Hale upon service of the Hale complaint in early February, 1980. *See* UCC § 1–201(26) & (27).

**73.** DTC received copies of the various loan documents upon which the Hale interest is predicated, which was sufficient notification of the secured party's interest under UCC § 9–305. *Cf. In re Copeland*, 531 F.2d 1195, 1205, 18 UCC Rep. 833 (3d Cir. 1976) [escrow agent as bailee].

**74.** 1A Coogan § 6C.08[1][d], at p. 6C–132. *See* Coogan, *Security Interests in Investment Securities Under Revised Article 8 of the Uniform Commercial Code*, 92 Harv.L.Rev. 1013, 1057 (1979). *See also In re Copeland*, 531 F.2d 1195, 1204, 18 UCC Rep. 833, 843 (3d Cir. 1976).

**75.** *In re Copeland*, 531 F.2d 1195, 1204, 18 UCC Rep. 833, 843 (3d Cir. 1976); *In re North American Builders, Inc.*, 320 F.Supp. 1229, 8 UCC Rep. 1132, 1135 (D.Neb.1970); *In re Black Watch Farms, Inc.*, 9 UCC Rep. 151, 155 (S.D. N.Y.B.J.1971). *See* note 60 *supra* & accompanying text. *Cf. In re Dolly Madison Industries, Inc.*, 351 F.Supp. 1038, 1042, 11 UCC Rep. 926, 931 (E.D.Pa.1972) [escrow agent may serve only the role stipulated in escrow agreement], *aff'd. per curiam*, 480 F.2d 917 (3d Cir. 1973).

**76.** "Historically and prior to the Code, possession of collateral by a creditor or third party has served to impart notice to prospective creditors of the *possessor's* possible interest there-

in." *In re Copeland*, 531 F.2d 1195, 1203, 18 UCC Rep. 833, 843 (3d Cir. 1976). (Emphasis added.)

Hale concedes that a bailee controlled by the debtor would not satisfy the notice requirements of UCC § 9–305. Supplemental Memorandum of Roger P. Hale, filed February 18, 1981, at 20.

**77.** *See* UCC §§ 8–204 & 8–201(1)(a), (c) & (3). *See also* Restatement of Security, § 22, Comment 6; Restatement of Torts, § 223(f). *See also* note 66 *supra*.

Hale points out appropriately enough that DTC is not under the control of the debtors as concerns the retention of these securities as collateral for the DTC loan, since DTC may reasonably be expected to safeguard its own interests by retaining the collateral until its debt is satisfied. The appropriate test is not the adequacy of DTC's possession as a means of perfecting its own security interest, however, but that of Hale. The timing and direction of the post-performance disposition of the collateral remains within the control of the debtors throughout. Therefore, the 'equity cushion' to which the Hale security interest attaches remains under the control of the debtors in these circumstances. *See Jenkins v. National Village Bank of Bowdoinham*, 58 Me. 275, 278 (1870).

est to creditors of the debtor. Why then does UCC § 9–305 require "notification" of the bailee? It can only have been because notification has long been viewed as essential to the *validity* of the nonpossessory pledge,[78] a substitute for the actual possession which is infeasible in the circumstances. "Notification" to the "bailee" of the secured party's interest under these circumstances means notification *by the pledgor* to the bailee, because relinquishment by the pledgor of control over the disposition of the collateral following performance is indispensable to the creation of a bailment conformable with the requirements of UCC § 9–305 for the perfection of the secondary pledge.

 Reliance on UCC § 9–305 in these circumstances appears to have been somewhat serendipitous. No steps whatever seem to have been contemplated or undertaken to perfect the Hale security interest until after default, when an insufficient financing statement was filed to perfect a security interest not subject to perfection by filing, and demand was made on DTC to permit redemption. The security interest was prohibited by the DTC pledge agreement. DTC resisted redemption. Yet the requirements of UCC § 9–305 can be read in such a "loose and relaxed"[79] way as to conscript DTC into involuntary service as the agent through whose possession a prohibited secondary security interest becomes perfected and interested third persons are to derive notice of the Hale encumbrance. For the reasons already expressed, in my judgment neither the language nor the purpose of UCC § 9–305 can accommodate the construction proposed by the plaintiff without scuttling an important Code provision.[80]

---

**78.** *See* Restatement of Security, § 8.

**79.** *Maine League Federal Credit Union v. Atlantic Motors,* Me., 250 A.2d 497, 500 (1969).

**80.** *See id.*