**In re HOUSECRAFT INDUSTRIES, USA, INC., Debtor.**

**Bankruptcy No. 91–10779.**

United States Bankruptcy Court, D. Vermont.

May 18, 1993.

J. Schwidde, Law Offices of Gleb Glinka, Rutland, VT, for Gleb Glinka, Chapter 7 Trustee ("Trustee").

C. Reis, Law Offices of Obuchowski & Reis, Bethel, VT, for Franklin County Industrial Development Corp. ("FCIDC").

## MEMORANDUM OF DECISION ON MOTION FOR RELIEF FROM STAY

FRANCIS G. CONRAD, Bankruptcy Judge.

The joint motion [1] of FCIDC and Franklin Lamoille Bank for relief from stay raises an issue of first impression in our jurisdiction concerning how a nonpossessory junior lien holder perfects its lien in a deposit money account that is in the exclusive possession of a senior lien holder when possession is the only method of perfection. In the Memorandum of Decision that follows, we grant FCIDC's motion for relief from stay and hold that a senior lien holder's

possession of a bank passbook coupled with written notification of a subordinate interest in the account creates a "bailee with notice" that perfects the subordinate interest in the account. We address the matter at length because of the importance of the issue herein to the various Vermont Industrial Development Corporations throughout Vermont.

### FACTS

On October 30, 1991, Housecraft Industries, USA, Inc., ("Housecraft") filed a petition for relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 101, *et seq.* Housecraft is a privately held Vermont corporation engaged in the manufacture, assembly, and distribution of household goods and wares, including mirrors and table settings.

Housecraft operated as a debtor in possession under 11 U.S.C. §§ 1107 and 1108 until the case was converted to Chapter 7 on March 17, 1992. On March 26, 1992, Trustee was appointed interim Chapter 7 trustee. Trustee qualified as the permanent Chapter 7 trustee on May 11, 1992.

While Housecraft was a debtor in possession, FCIDC and Franklin Lamoille Bank ("Bank") filed companion motions for relief from stay on February 21 and 24, 1992, respectively. We joined the two motions for relief from stay on February 27, 1992. After resolving several procedural matters involving an objection that was later withdrawn, we issued an order granting relief from stay on June 15, 1992. Trustee appealed our order because of improper service. On October 5, 1992, District Judge Billings reversed and remanded the order with instructions that Trustee be served with the necessary papers.

On November 9, 1992, we again held a hearing on FCIDC's motion for relief from stay and for abandonment of the relevant property. Following the hearing, FCIDC and Trustee submitted memoranda of law

---

1. We have jurisdiction to hear this matter under 28 U.S.C. § 1334(b) and the general reference to this Court by the United States District Court for the District of Vermont. This is a core proceeding under 28 USC § 157(b)(2)(G) and (O). This

Memorandum of Decision constitutes findings of fact and conclusions of law under Federal Rule of Civil Procedure Rule 52, as made applicable by Federal Rules of Bankruptcy Procedure Rule 7052.

in support of their respective motions for summary judgment concerning FCIDC's motion for relief from stay. These motions were denied. At a trial held on March 29, 1993 and following testimony by two witnesses, we requested briefs from the parties and took the matter under advisement. The automatic stay remained in effect pending delivery of briefs and the rendering of a decision.

■ The following facts are relevant to the issues raised in the present motion for relief from stay and are substantially undisputed. On June 6, 1990, Housecraft executed a hypothecation agreement (the "Hypothecation Agreement")[2] in which it pledged to Bank Housecraft's passbook savings account number 0–83308 (the "Passbook Account" or "Passbook") containing $132,000.00 as collateral to secure a $132,000.00 loan to FCIDC by Bank. The Hypothecation Agreement states that Housecraft has no right of withdrawal from the Passbook Account until FCIDC repays all relevant loans to Bank.

Also on June 6, 1990, Housecraft executed a security agreement (the "Security Agreement") for the benefit of FCIDC. The Security Agreement states that the Passbook Account secures payment of several debts, including a promissory note dated August 18, 1987 in the amount of $60,000.00 from Housecraft to FCIDC; a promissory note dated June 5, 1990 in the amount of $132,000.00 from Housecraft to FCIDC; Housecraft's obligations under a lease from FCIDC dated August 18, 1987; and all other liabilities owing from Housecraft to FCIDC.[3] Following execution of the Security and Hypothecation Agreements and during all periods relevant here,

Bank maintained exclusive possession of the Passbook.

Two witnesses testified at the March 29, 1993 trial. T.J. Soule, an executive director of FCIDC, testified that security interests in deposit accounts were a common feature of Vermont Industrial Development Authority ("VIDA") financing. VIDA required the participation of a local development corporation like FCIDC before financing a given development project.

Soule testified that FCIDC and the Bank agreed that Housecraft's $132,000.00 deposit account would be held at the Bank as security for FCIDC's $132,000.00 loan from the Bank. The Passbook Account secured Housecraft's 10% pass-through participation in FCIDC. This participation in FCIDC, in turn, triggered the financial support of VIDA. Soule also testified that to the extent that the account exceeded $132,000.00, the Passbook secured FCIDC's $60,000.00 loan to Housecraft. It is not disputed that FCIDC is presently undersecured.

The second witness, H.D. Langevin, vice president of commercial loans at Bank, testified that Bank agreed orally at the June 6, 1990 closing to hold Housecraft's Passbook Account as collateral not only for its interest in the funds but also for FCIDC's security interest in the same funds. To offer evidence of the oral agreement, FCIDC moved for the admission of a letter addressed to Langevin that described, albeit briefly, the relationship among Housecraft, FCIDC, and Bank.[4] The letter, dated February 5, 1991, purported to memorialize a prior conversation between L.H. Bruce, attorney for FCIDC, and Langevin concerning the FCIDC, Bank, and Housecraft closing on June 6, 1990. In the letter, Bruce

---

**2.** A hypothecation is a contract of mortgage or pledge in which a debtor maintains possession of the collateral and there is no physical transfer of the pledged property to the lender. See, 42 C.J.S. Hypothecation, 470. The Hypothecation Agreement is not a true hypothecation because Bank took actual possession of Housecraft's passbook.

**3.** Trial Ex. 5, March 29, 1993.

**4.** The letter states, in pertinent part:
based on prior conversations and correspondence with you, it is my understanding that

the $132,000 passbook secures FCIDC's loan to Housecraft and Franklin–Lamoille's loan to FCIDC. In addition, by the terms of the Agreement the passbook secures other obligations of Housecraft to FCIDC. In other words, it's critical that we all have a clear understanding that the reduction of the principal balance of the $132,000 loan does not entitle Housecraft to reduce the balance in the passbook account until such time as all obligations to FCIDC total less than $132,000.

stated that, according to his understanding of the facts, the Bank held the Passbook as collateral for FCIDC as well as for Bank's loan to FCIDC. Bruce also requested that the Bank confirm the account number and that it indeed possessed the passbook. No reply letter was introduced at trial.[5]

Trustee objected to the admission of the February 5, 1991 letter on several grounds, including lack of foundation. We reserved decision on the letter's admissibility pending full consideration of all matters relating to the perfection issue.

## DISCUSSION

We first address the admissibility of the letter dated February 5, 1991. During the March 29, 1993 hearing, FCIDC moved for the letter's admission in evidence to show an oral agreement between Bank and FCIDC. FCIDC contends that the letter is admissible to show that Bank and FCIDC agreed orally that Bank would hold the Passbook as FCIDC's bailee and to show that Bank had notice of FCIDC's subordinate interest in the collateral. Trustee objected because the letter was contemporaneous with the alleged agreement and lacked sufficient foundation for the Court to find that Bank received the letter.

■ We agree with FCIDC that the letter is admissible to show that Bank had notice of FCIDC's interest in the Passbook. The letter is also admissible to show the existence of an oral agreement between Bank and FCIDC, although its probative weight as evidence of such an agreement is marginal at best.

■ As a preliminary matter, we find that the February 5, 1991 letter is clearly

relevant to the key issue underlying FCIDC's motion for relief from stay, i.e., whether Bank's possession of the Passbook perfects FCIDC's subordinate interest in the same account under the common law of pledges. Langevin testified that he was vice president of commercial loans at Bank during the relevant time periods and was the loan officer overseeing the June 6, 1990 closing. The witness then testified that the letter was kept in the Bank's files. The letter is therefore admissible to show that Bank received notice of FCIDC's subordinate interest in the Passbook and, by implication, to show an earlier agreement between Bank and FCIDC that Bank held the Passbook as both a pledgee for its own interests and as a bailee or agent for FCIDC.

Trustee's objection that the letter was contemporaneous with the June 6, 1989 closing is also insufficient to exclude the letter from evidence. During the March 29, 1993 trial, Trustee argued that the letter was inadmissible under the parol evidence rule.

■ The parol evidence rule seeks to preserve the integrity of written agreements and bars admission of prior or contemporaneous statements that vary or modify terms of an existing written contract. See, *Ohanian v. Avis Rent A Car System, Inc.*, 779 F.2d 101, 108 (2d Cir. 1985); *Wallace Steel, Inc. v. Ingersoll–Rand Company*, 739 F.2d 112, 115 (2d Cir.1984) (citations omitted). FCIDC has consistently argued, however, that an oral agreement rather than a written contract existed between FCIDC and Bank concerning possession of the Passbook. The parol evidence rule is therefore inapplicable.

---

**5.** The record shows additional correspondence that is, at a minimum, relevant to Bank's possession of the Passbook. On September 5, 1990, Bruce addressed a letter to Langevin requesting confirmation that Bank was holding Housecraft's Passbook as collateral for Bank's loan to FCIDC. On September 12, 1990, Langevin replied on behalf of Bank and wrote that the Passbook was held by the Bank as collateral for Bank's loan to FCIDC. Neither letter discusses whether Bank was also holding the Passbook as collateral for FCIDC's loans to Housecraft.

Although both letters were attached as exhibits to Bank's Memorandum of Law dated June 2, 1992 and Trustee's Memorandum of Law dated March 6, 1993, neither FCIDC nor Trustee moved for the letters' admission as evidence during the March 29, 1993 hearing. Given the contested admissibility of the February 5, 1991 letter, we decline to exercise our discretion to include the September 5 and September 12, 1990 letters in our findings of fact. We therefore disregard the September 12, 1990 letter in our resolution of the issues presented in the motion *sub judice.*

---

Moreover, the parol evidence rule does not apply to statements and modifications made after execution of a written contract. In contrast, the letter at issue is dated approximately eight months after the closing date when the parties executed both the Security and Hypothecation Agreements and entered into the alleged oral agreement.

■ Trustee also argues that the letter is not admissible because it was offered in evidence without foundation of its delivery to Bank or its deposit in the mails. Langevin, an agent of Bank, testified that the letter was held at Bank in its files. The fact that Bank held that letter obviates the need for testimony concerning delivery or mailing. The letter is therefore admissible to show that Bank had knowledge of FCIDC's subordinate interest in Housecraft's Passbook. See, generally, M. Graham, Federal Practice and Procedure: Evidence § 6549 (1992).

■ We also conclude that FCIDC has met its burden of proof concerning the existence of an oral agreement between FCIDC and Bank. During the March 29, 1993 trial, FCIDC offered the testimony of two witnesses, one of whom, Langevin, testified that Bank orally agreed at the June 6, 1990 closing to hold both FCIDC's interest in the Passbook and its own. As evidence of the oral agreement, FCIDC moved for the admission of a letter, dated February 5, 1991, stating that the Passbook secured FCIDC's loans to Housecraft as well as Bank's $132,000.00 loan to FCIDC. We held, supra, that the letter was admissible into evidence. Although there is little support, beyond Langevin's testimony, for the existence of the oral agreement, we conclude that it is more likely than not that

such an agreement occurred. As the loan officer involved in the June 6, 1990 closing, Langevin had personal knowledge of the relationship between FCIDC and Bank. In addition, Trustee failed to produce evidence, either written or testimonial, that controverted Langevin's statement that an oral agreement existed. FCIDC therefore carried its burden of showing by a preponderance of the evidence that an oral agreement existed between FCIDC and Bank concerning Bank's possession of the Passbook.

We next direct our attention to the substance of FCIDC's motion for relief from stay. Section 362(d) of the Bankruptcy Code provides that relief from stay shall be granted when the debtor has no equity in the encumbered property and the encumbered property is not necessary for an effective reorganization.[6] During the March 29, 1993 trial, Trustee and FCIDC stipulated that the debt Housecraft owes to FCIDC exceeds the value of the collateral, i.e., the funds in the Passbook Account at Bank. Also, because this is a Chapter 7 case, there is no possibility of reorganization. The remaining issues for disposition are whether Bank's possession of the Passbook Account perfects FCIDC's subordinate interest in the account under a third-party bailee or agency theory and, if so, whether the property should be abandoned to FCIDC under 11 U.S.C. § 554(b).[7]

FCIDC argues that it is entitled to relief from stay as a perfected secured creditor in Housecraft's Passbook. FCIDC claims that its interest in the Passbook is perfected because Bank maintained possession of the Passbook as a "bailee with notice" after FCIDC notified Bank of its interest in the collateral. In further support of its

6. Bankruptcy Code § 362(d) states, in relevant part:

On request of a party in interest and after notice and a hearing, the court shall grant relief from stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—

* * * * * *

(2) with respect to a stay of an act against property under subsection (a) of this section, if—

(A) the debtor does not have an equity in such property; and

(B) such property is not necessary to an effective reorganization.

7. 11 U.S.C. § 554(b) provides that [o]n the request of a party in interest and after notice and a hearing, the court may order the trustee to abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate.

motion, FCIDC also contends that Bank orally agreed to hold the Passbook as FCIDC's bailee.

Trustee argues that Bank, as an interested pledgee, may not become a second pledgee's bailee absent an express agreement among FCIDC, Bank, and Housecraft. Notification alone, according to Trustee, is insufficient to create a constructive bailment whereby Bank would assume the legal obligations of FCIDC's bailee or agent. Trustee also asserts, on policy grounds, that interested bailees are ill-suited to apprise the commercial world of additional security interests in collateral.

Before discussing the merits of the parties' respective positions, we first review the rich history of the common law pledge and its statutory preservation in the Uniform Commercial Code.

 At common law, a deposit account is a species of personal property known as a general intangible. The account is intangible because it does not represent a thing but rather a debt due from a bank.[8] The common law name for such a right to payment is a chose in action.

 An enforceable security interest in a passbook account can be created either through a pledge or a security assignment of a chose in action.[9] Under the facts of FCIDC's motion, we need concern ourselves only with the law applicable to pledges.

 To pledge a deposit account, a debtor must pledge an "indispensable instrument" representing the account. The

Restatement of Security defines an indispensable instrument as

> the formal written evidence of an interest in intangibles, so representing the intangible that the enjoyment, transfer or enforcement of the intangible depends upon possession of the instrument. Indispensable instruments include ... savings bank books.

Restatement of Security, § 1(e) (1942). Where a debtor pledges its interest in a deposit account, the secured party takes possession of the account's passbook in much the same way as he or she would possess tangible collateral. Delivery of the passbook to the secured creditor, i.e., possession, notifies third party creditors that the debtor no longer has unlimited use of the deposit account.

Until the early nineteenth century, the only way to create a valid interest in personal property was by physical pledge—the transfer of possession of the property (collateral) by a debtor (the pledgor) to the creditor or secured party (the pledgee).[10] Possession provided public notice of a secured party's interest in collateral and prevented debtors from selling their pledged property to innocent purchasers or from obtaining credit based on encumbered assets. To further protect third parties against undisclosed interests in property, the common law presumed that nonpossessory interests were fraudulent and therefore unenforceable against third parties. Twyne's Case, 76 Eng.Rep. 809 (Star Chamber 1601).

The increasing demands of the credit economy eventually created a need for col-

---

**8.** A bank and its depositor have a creditor/debtor relationship. A deposit account is a credit maintained by the bank in favor of the depositor. See, D. Greene, Deposit Accounts As Bank Loan Collateral Beyond Setoff to Perfection—The Common Law Is Alive and Well, 39 Drake L.Rev. 259, n. 24–26 (1990).

**9.** The assignment of a chose in action involving deposit accounts has generated conflicting case-law. Some courts argue against assigning security interests in deposit account because one cannot have a lien on one's own property. See, In re Amco Prods. Inc., 17 B.R. 758, 762 (Bkrtcy. W.D.Mo.1982). The better view, however, is consistent with other common law cases involv-

ing security interests in choses of action. This view states that the chose of action arising out of a deposit account is an intangible property right that, like other intangibles, may have a security interest created in it. See, Trust Co. v. United States, 735 F.2d 447, 449 (11th Cir.1984); See also, D. Greene, supra, 39 Drake L.Rev. at n. 37, 38.

**10.** P. Coogan, Article 9—An Agenda for the Next Decade, 87 Yale L.J. 1012, 1014. See, G. Gilmore, Security Interests in Personal Property (1965). Professor Grant Gilmore was chief draftsman and principal architect of Article 9 and a visiting professor at Vermont Law School.

lateral that remained in a debtor's possession. Limited only by their creativity, debtors, creditors, and their counsel formulated methods of perfection that provided both possession to debtors and security to creditors. The resulting rules varied from jurisdiction to jurisdiction, producing what one commentator has called a "labyrinthine melange" of personal property securities laws.[11] Throughout this development toward modern commercial law, the common law pledge existed side by side with other forms of perfecting security interests in personal property.

The Uniform Commercial Code, adopted in Vermont in 1966, streamlined commercial law and preserved the pledge to complement a public filing system. Article 9 of the UCC, codified at 9A Vt.Stat.Ann. § 9–

101 *et seq.* (1991), governs security interests in most forms of personal property and fixtures. Article 9 recognizes three general ways to perfect a security interest: filing (public registration); possession of the collateral, either directly, constructively or through an agent; and third party notice, including notice given by the secured party to another holding the collateral.[12]

■ Some forms of personal property do not fit under Article 9's broad umbrella. Of particular relevance in FCIDC's motion for relief from stay is 9A Vt.Stat.Ann. § 9–104(k). Section 9–104(k) provides that Article 9 does not apply to security interests in, and pledges of, various deposit accounts.[13] Article 9, therefore, does not control disposition of the present dispute between Trustee and FCIDC.[14] In this and other anoma-

---

**11.** See, P. Coogan, Article 9—An Agenda for the Next Decade, 87 Yale L.J. 1012, 1015 (1978), quoting, J. MacLachlan, Handbook of the Law of Bankruptcy, 257, n. 8 (1956).

**12.** See, J. Levie, Secured Transactions, Perfection by Possession: Two Recent Decisions, 209 N.Y.L.J. 91, May 13, 1993, at 5, col. 1.

**13.** 9A Vt.Stat.Ann. § 9–104 provides in pertinent part:

This article does not apply ...
(k) to a transfer in whole or in part of any of the following: any claim arising out of tort; *any deposit, savings, passbook or like account maintained with a bank,* savings and loan association, credit union or like organization (emphasis ours).

The UCC's explanation for excluding deposit accounts from Article 9 is cursory at best. Official Comment 7 of § 9–104 provides, in pertinent part:

Rights under ... deposit accounts, are often put up as collateral. Such transactions are often quite special, do not fit easily under a general commercial statute and are adequately covered by existing law.

No other rationale of the deposit account exclusion exists. Commentators, however, have speculated that deposit accounts were excluded from Article 9 "largely for political reasons in light of the vociferous opposition to the UCC on the parts of banks and their counsel." Greene, supra, 39 Drake L.Rev. at n. 4, citing, Gilmore, supra, § 10.7, 315–316 and C. Willard, The History of the Uniform Commercial Code, documents 23, 27, 36, 37 and *passim* (unpublished private history of the UCC on file at Davis, Polk & Wardwell, New York, New York).

The 1972 amendments of Article 9 define a deposit account as

a demand, time, savings, passbook or like account maintained with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a certificate of deposit.

See, UCC 9–105(1)(e). We note that Vermont has not adopted the 1972 amendments to Article 9. The parties do not dispute, however, that the Housecraft account is a passbook or deposit account. For insight into the UCC definition of a deposit account, see, McLaughlin, Security Interests in Deposit Accounts: Unresolved Problems and Unanswered Questions Under Existing Law, 54 Brook.L.Rev. 45 (1988).

**14.** Several states, including California, Hawaii, and Illinois, recently amended their UCC statutes to include deposit accounts among the security interests covered under Article 9. In similar statutes, California and Hawaii provide that security interests in deposit accounts are perfected when either a security agreement is executed and the secured party maintains possession of the account, or when written notice of the security interest is given to an organization maintaining the account. See, Cal.Com. Code § 9302(g) (West 1993) and Haw.Rev.Stat. § 490:9–302(h) (1993). Illinois' revision of § 9–302 resurrects the common law attornment rule previously rejected in Official Comment 2 of § 9–305. Illinois provides that a security interest in a deposit account "maintained with any organization other than the secured party [is perfected] when notice thereof is given in writing to the organization with whom the deposit account is maintained and that organization provides written acknowledgement of and consent to the notice of the secured party." See, Ill.Rev.Stat. ch. 810 § 5/9–302(h) (1993). For a general discussion of suggested legislative reforms relating to deposits accounts and the

lous circumstances where Article 9 does not state the applicable law, pre-UCC common law governs the interests of the parties and their respective claims to collateral. 9A Vt.Stat.Ann. § 1–103 (1991); 1 Vt. Stat.Ann. § 271 (1991).

Although the common law determines the governing law where Article 9 does not apply, certain sections of Article 9 codify—often with little or no alteration—the applicable common law rules. In these situations, Article 9 provides persuasive authority in disputes involving security interests that are expressly excluded from the UCC. For example, 9A Vt.Stat.Ann. § 9–305 defines perfection by possession according to pre-UCC pledge law.[15] Commenting on the common law's similarity to § 9–305, the drafters of Article 9, including Professor Gilmore, predicted that notwithstanding the exclusion of deposit accounts, developing common law rules would likely become "identical with the [UCC] statutory rules." [16]

▮▮▮▮ Before comparing analogous UCC cases, we must first discuss the common law regarding pledges. In Vermont, the elements of a pledge include an intention to pledge collateral to secure an indebtedness, delivery of the pledged collateral, and possession of the collateral by the pledgee or by a third person acting on the pledgee's behalf for the purposes of securing a debt. *Shurtleff v. Norcross & Trustee*, 95 Vt. 420, 424, 115 A. 494 (1921). Collateral is typically redeemable upon specified terms and is subject to sale in the event of default. A pledge creates a fiduciary relationship where the pledgee owes the duties of a trustee to the pledgor. See, *Pettit v. Olean Industries, Inc.*, 266 F.2d 833, 835 (2d Cir.1959); *Gins v. Mauser*

*Plumbing Supply Co.*, 148 F.2d 974, 979 (2d Cir.1945).

▮▮▮▮ A pledgor, like a bailor, relinquishes actual possession and dominion and control over his or her property to a pledgee during the term of a pledge. *Zweeres v. Thibault*, 112 Vt. 264, 268, 23 A.2d 529 (1942). Although the secured party usually takes possession of the pledgor's collateral, a third party bailee, subject to several restrictions, may also hold the collateral as an agent of the pledgee. *Shurtleff v. Norcross & Trustee, supra*, 95 Vt. at 424, 115 A. 494. The pledgor, or anyone closely affiliated with the pledgor, may not be a bailee. See, *In re Atlantic Computer Systems Inc.*, 135 B.R. 463, 466–467 (Bkrtcy. S.D.N.Y.1992) (citations omitted). There is no requirement, however, that a bailee be the secured party's bailee. *Id.*, 135 B.R. at 467; *In re Copeland*, 531 F.2d 1195, 1204 (3d Cir.1976); See, 9a Vt.Stat.Ann. § 9–305, Official Comment 2 ("Possession may be by the secured party himself or by an agent on his behalf: it is of course clear, however, that the debtor or a person controlled by him cannot qualify as such an agent for the secured party ..."). These rules comport with one of the fundamental policy goals of both the UCC and the common law of pledges, i.e., that a "debtor's lack of possession coupled with actual possession by the creditor, the creditor's agent or the bailee serves to provide notice to prospective third party creditors that a debtor no longer has unfettered use of its property." *Ingersoll–Rand Financial Corp. v. Nunley*, 671 F.2d 842, 844–845 (4th Cir.1982), quoting, *In re Copeland*, 391 F.Supp. 134, 151 (D.Del.1975) (interpreting UCC § 9–305).

UCC, see, Zubrow, Integration of Deposit Account Financing into Article 9 of the Uniform Commercial Code: A Proposal for Legislative Reform, 68 Minn.L.Rev. 899 (1984).

**15.** 9A Vt.Stat.Ann. § 9–305 provides, in pertinent part:
A security interest in [certain property] may be perfected by the secured party's taking possession of the collateral. If such collateral ... is held by a bailee, the secured party is deemed to have possession from the time the bailee receives notification of the secured par-

ty's interest. A security interest is perfected by possession from the time possession is taken without relation back and continues only so long as possession is retained ... Section 9–305 adopts verbatim most of the language used in the Restatement of Security, § 8 (1941).

**16.** G. Gilmore, supra, § 10.7 at 315. See, D. Greene, Deposit Accounts as Bank Loan Collateral Beyond Setoff to Perfection—The Common Law Is Alive and Well, 39 Drake.L.Rev. 259, n. 4 (1990).

▇▇▇ Possession is essential to perfect an interest in pledged collateral. In the simplest pledge scenario, a pledgee's possession of the collateral perfects his or her interest in the property. *Shurtleff v. Norcross & Trustee, supra,* 95 Vt. at 424, 115 A. 494; *Vermont Evaporator Co. v. Taft,* 107 Vt. 400, 403, 181 A. 100 (1935); See, 9A Vt.Stat.Ann. § 9–305 (1991). A creditor may, however, perfect his or her interest in collateral without taking physical possession of the debtor's property. At common law and under the UCC, delivery of collateral to a bailee [17] and the bailee's continuing possession perfects a pledge of collateral. See, *Gins v. Mauser Plumbing Supply Co.,* 148 F.2d 974, 977–978 (2d Cir. 1945); *Pierce v. National Bank of Commerce of St. Louis,* 268 F. 487, 493 (8th Cir.1920); *Schram v. Sage,* 46 F.Supp. 381, 383 (E.D.Mich.1942): *In re Kontaratos,* 10 B.R. 956, 965 (Bkrtcy.D.Me.1981) (analogizing to UCC § 9–305).

▇▇▇ As a matter of law, a debtor may pledge his or her property more than once, assuming there is equity in the collateral to support the second pledge. *Shurtleff v. Norcross & Trustee, supra,* 95 Vt. at 424, 115 A. 494 ("The possession of the [collateral] by the first pledgee may be regarded as the possession of the second pledgee through the agency of the [first pledgee]."); *Gins v. Mauser Plumbing Supply Co., Inc., supra,* 148 F.2d at 978 (citations omitted). Obviously, two secured creditors cannot take actual possession of the same pledged collateral concomitantly. See, *In re Chapman,* 5 UCC Rep.Serv. 649, 652, 1968 WL 9256 (W.D.Mich.1968). At common law, this impossibility gave rise to a legal fiction known as a constructive bailment.

▇▇▇ Under the constructive bailment theory, the common law permits a second pledgee to perfect its interest in pledged collateral through unilateral notification to the first pledgee. *Miller v. Wells Fargo Bank International Corp.,* 540 F.2d 548, 561 (2d Cir.1976) (citation omitted). A second pledgee has constructive possession from the time that a bailee, or first pledgee, receives notice of a second pledgee's interest in the collateral. See, Gilmore, supra, § 14.2, 440 (citations omitted). Acknowledging the general rule, the Restatement of Security provides that notice to a bailee perfects a second pledgee's interest in the collateral:

> Where the chattel is in the possession of a third person a pledge may be created by assent of the pledgor and notification by either pledgor or pledgee, to the third person, that the chattel has been pledged to the pledgee.

Restatement of Security, § 8 (1941). Article 9 codifies this common law notice rule in § 9–305. See, 9A Vt.Stat.Ann. § 9–305 and Official Comment 2. Applying the constructive bailment rule to the case of a double pledge of the same collateral, several courts have held that the first pledgee's possession perfects the interests of a subsequent pledgee. See, *Pierce v. National Bank of Commerce, supra; Schram v. Sage,* 46 F.Supp. 381 (E.D.Mich.1942); *In re Chapman, supra.* See also, Gilmore, *supra,* § 14.2, 440–441, n. 3.

This notification rule represents a change in the common law during the several decades preceding widespread enactment of the UCC. In contrast, at early common law, a bailee's consent to a later pledge was a prerequisite to the second pledgee's perfected interest once the first pledge had notice of the subordinate interest in the collateral. Courts generally required the first pledgee to attorn to the second pledgee or otherwise acknowledge that the first pledgee held the collateral on behalf of the second pledgee. More recent case law, as well as UCC Article 9, however, rejects the attornment rule. See, 9A Vt.Stat.Ann. § 9–305 Official Comment 2 (1991). See also, Gilmore, *supra,* § 14.2, 440, n. 3, citing, *Pierce v. National Bank*

---

**17.** A bailment is the delivery of personal property from one person to another for a specific purpose such that when the purpose is complete, the property is redelivered as directed by the person who delivered it. See, *In re STN*

*Enterprises, Inc.,* 51 B.R. 132, 136 (Bkrtcy.D.Vt. 1985), citing, *Zweeres v. Thibault,* 112 Vt. 264, 267–268, 23 A.2d 529 (1942); see also, *James Smith Woolen Machine Co. v. Holden,* 73 Vt. 396, 401, 51 A. 2 (1901).

*of Commerce,* 268 F. 487 (8th Cir.1920) (second pledgee's notice to pledgee in possession created a pledge without delivery to second pledgee; first pledgee had contested validity of second pledge).

Today, assuming that all other elements of a pledge are satisfied, notification to a bailee or senior pledgee creates a perfected security interest. In summarizing the notification rule, the Restatement of Security reasoned as follows:

> While ordinarily an agency can not be created without consent of the agent (Restatement of Agency § 15), it is not considered desirable to require the consent of the third person as a condition precedent to the creation of the pledge. The third person's duties are not altered in any material respect by the pledge. To make the third person's consent a test of the creation of a pledge would invest him with an arbitrary power of affecting the interest of the other parties. The third person of course, may surrender the possession if he does not wish to be under any duty to the pledgee.

Restatement of Security, § 8, Comment A (1941). At least one court, however, has allowed a first pledgee to escape the role of bailee in a case involving a double pledge. In *Winnett v. Inverness, Inc.,* No. 76 Civ. 3810 (S.D.N.Y. August 14, 1979), aff'd mem., 614 F.2d 1293 (2d Cir.1979) (unpublished opinion), the Court held that a first pledgee may refuse to act as a bailee for a second pledgee. If the first pledgee is unwilling to act as a bailee for the junior security interest, then the junior security interest is invalid and unenforceable. Id.

Article 9 reiterates the common law view that notification to a bailee perfects a pledgee's interest in the collateral. Section 9–305 provides, in pertinent part:

> [i]f such collateral ... is held by a bailee, the secured party is deemed to have possession from the time the bailee receives notification of the secured party's interest.

9A Vt.Stat.Ann. § 9–305 (1991). Article 9 places only one restriction on who may be a bailee to perfect another's interest in collateral. Official Comment 2 of 9A Vt.Stat.

Ann. § 9–305 states that "possession may be by the secured party himself or by an agent on his behalf: it is of course clear, however, that the debtor or a person controlled by him cannot qualify as such an agent for the secured party...." See, *In re Atlantic Computer Systems Inc.,* 135 B.R. 463, 466–467 (Bkrtcy.S.D.N.Y.1992). As long as a pledgee is not controlled by a debtor, neither the statute nor the policies underlying § 9–305 prohibit a pledgee from serving as a bailee for an additional pledgee.

Similarly, UCC cases involving § 9–305 follow the common law rule that notice to a one pledgee perfects an additional pledge of the relevant collateral. For example, *In re Chapman,* 5 UCC Rep.Serv. 649 (Bkrtcy.W.D.Mich.1968), concerned a double pledge arrangement involving two creditors with security interests in the same note. When the debtor filed for bankruptcy, the note was in the possession of the junior creditor. The trustee argued that the senior creditor was thus unperfected under § 70(c) of the 1898 Bankruptcy Act. Bankruptcy Referee Nims held that possession of the note by the junior creditor fulfilled the notice policy of § 9–305 because the debtor had no meaningful control over the collateral. *Id.,* 5 UCC Rep.Serv. at 651–653.

*Landmark Land Co., Inc. v. Sprague,* 529 F.Supp. 971 (S.D.N.Y.1981) reached a like result, albeit in the context of an express agreement among the debtor and its creditors. In *Landmark Land,* a debtor assigned its interests in a promissory note several times as security for repayment of its various obligations. One of the debtor's secured creditors took possession of the promissory note simultaneously with the first assignment and maintained possession of the note throughout later assignments. *Id.* at 974. Concerning whether a junior lien creditor had a perfected interest under UCC § 9–305 in a note within the possession of a senior lien creditor, the court held:

> Where ... the senior secured party in possession of the collateral acknowledges and accepts the instructions of the pledgor to deliver the collateral to the junior

secured party after the debt to the senior secured party is satisfied, then the senior secured party is considered to possess the collateral as the agent or bailee of the junior secured party.

Id. at 980, rev'd. on other grounds, 701 F.2d 1065, 1068 (2d Cir.1983). Similarly, *Merchants Bank v. Reddington/Sunstar Ltd. Partnership (In re Reddington/Sunstar Ltd, Partnership)*, 100 B.R. 1, 6–7 (Bkrtcy.D.Ariz.1989) held that a senior lienholder's possession of collateral perfected a junior lienholder's security interest in the pledged property. The facts in both *Merchants Bank* and *Landmark Land*, however, differ from the facts presented in FCIDC's motion because both cases involved written agreements between the secured parties and the debtors concerning possession of the collateral. Here, FCIDC contends that the parties orally agreed that Bank would hold the Passbook to perfect both Bank and FCIDC.

*In re Kontaratos*, 10 B.R. 956 (Bkrtcy. D.Me.1981), involved a double pledge of collateral where a subordinate pledgee notified the senior pledgee that it had an interest in the pledged property. Bankruptcy Judge Cyr held that a pledgor, rather than a subordinate pledgee, must give notice to a senior pledgee concerning an additional pledge to another creditor when a contract between the pledgor and senior pledgee stated that the collateral would remain free of additional encumbrances. More importantly, Judge Cyr stated that § 9–305 cannot be interpreted to conscript a senior pledgee into involuntary service as an agent of a subordinate pledgee when such an arrangement was disallowed under the first pledgee's agreement with the debtor. *Id.*, 10 B.R. at 966–967. Although Judge Cyr openly criticized the bailee with notice concept under § 9–305, the holding appears limited to cases where a debtor and a first pledgee agree that the collateral will not be pledged to other creditors. *Id.* at 968.

One court interpreting § 9–305 has expressed reluctance to extend the constructive bailment theory to cases were the bailee also has an interest in the pledged collateral. *Coral Petroleum, Inc. v. Banque Paribas (In re Coral Petroleum, Inc.)*, 50

B.R. 830 (Bkrtcy.S.D.Tex.1985), forms the basis of Trustee's argument that FCIDC's unilateral notice to Bank was insufficient to create an implied or constructive bailment to perfect FCIDC's interest in the Passbook. *In re Coral Petroleum* involved a pledge of a debtor's third-party note as security for a loan. Bankruptcy Judge Leal held that an interested senior pledgee could not serve as a bailee to perfect the interest of a subordinate creditor absent an express bailment agreement and an acceptance on the part of the potential bailee to be a party to the bailment. Judge Leal reasoned, in dicta, as follows:

> [b]y requiring the bailee to have no interest in the [collateral] in its possession, the danger of the bailee trying to pass the [collateral] off as [its] own is averted. The commercial world can rely upon an independent agent to represent accurately that the liens on the [collateral] do, in fact, exist. To require an interested party to inform the world of all other lien claimants, without an express agreement, would be a duty which the case law does not impose for the reason that the interested lienholder, who is also a bailee, would communicate conflicting signals to the commercial world for he would exercise unilateral control over the [collateral] while supposedly holding it for the benefit of another secured party. These are inconsistent positions that would cause chaos in commercial transactions.

*Id.*, 50 B.R. at 839–840. Trustee argues that the holding in *In re Coral Petroleum* applies to the case at bar because FCIDC failed to enter into an express bailment agreement with Bank. Trustee contends that it would be unreasonable, without consent, to require a first pledgor to inform subsequent creditors of a security interest subordinate to its own. This argument, however, misapplies the purpose of § 9–305 and fails under the plain meaning of § 9–305. Although Judge Leal raises logical objections to a literal reading of § 9–305, courts should refrain from interpreting statutes in a manner contrary to the plain meaning of the statutory language. Offi-

cial Comment 2 provides that § 9–305 "rejects the common law doctrine that it is necessary for the bailee to attorn to the secured party or acknowledge that he now holds on his behalf." Therefore, according to the clear statutory language of § 9–305, unilateral notice to a bailee perfects the interests of a pledgee in the collateral, regardless of whether the parties enter into a written bailment agreement. *In re Atlantic Computer Systems Inc., supra,* 135 B.R. 463 at 467–468.

▮ In the motion now before us, Trustee and FCIDC do not dispute the aforementioned general principles of pledge law and their applicability here. For example, the parties agree that a pledgee's possession of collateral perfects his or her interest in the collateral and that a bailee's possession creates a similar result. The parties also agree that Bank maintained possession of Housecraft's Passbook throughout the period relevant to FCIDC's motion. The parties disagree, however, concerning the requirements in perfecting a subordinate interest in a passbook already in the exclusive possession of the senior pledgee.

FCIDC contends that Bank orally agreed to hold the Passbook not only as a pledgee but also as FCIDC's bailee. Alternatively, FCIDC argues that under an implied bailment theory, FCIDC's February 5, 1991 letter to Bank rendered Bank a bailee with notice under both common law and, by analogy, under Vermont's Article 9 of the UCC.

Trustee argues that an interested bailee is ill-suited to fulfill the public notice function as a bailee for a subordinate interest in the pledged collateral. Along these lines, Trustee also argues that a written agreement among the parties is necessary to perfect a subordinate pledgee's interest in collateral held by a senior pledgee.

▮ Trustee correctly argues that, ordinarily, an agency cannot be created without the consent of the agent. See, Restatement, Agency, § 15. The drafters of the Restatement of Security, however, did not think it desirable to require the consent of a third party as a condition precedent to the creation of a secondary pledge. Restatement of Security, § 8, Comment A. The UCC rejection of the attornment rule appears based on a similar conclusion. See, 9a Vt.Stat.Ann. § 9–305, Official Comment 2. Giving a first pledgee veto power over any subsequent pledges would limit a debtor's ability to contract and would remove the collateral from commerce beyond the initial pledge transaction. A bailee may surrender possession of the collateral if he or she does not want to be under any obligation to a later pledgee. Id.

▮ The creation of the agency relationship between the first and second pledgees does not materially alter the duties of the first pledgee to the pledgor. In any pledge, a pledgee owes a fiduciary duty to the pledgor to maintain the collateral and prevent its loss, theft, or waste. *Gins v. Mauser Plumbing Co., Inc., supra,* 148 F.2d at 979. For example, if the pledgee sells the collateral upon the pledgor's default, then the pledgee must sell the property in good faith and in a commercially reasonable manner. Once collateral is pledged a second time, the first pledgee's obligations to the pledgor remain the same until satisfaction of the debt giving rise to the first pledge arrangement. A senior pledgee must then turn over the collateral to a second pledgee or its bailee to continue the second pledgee's perfected interest in the property and therefore prevent a gap in perfection.[18] Otherwise, if a first pledgee were to deliver the collateral to the pledgor after payment of the pledgor's debt, the second pledgee would no longer be perfected because subsequent creditors and pur-

---

18. Although the law simply requires that a second pledgee notify a first pledgee of his or her interest in the collateral, a second pledgee would be well advised to not only provide written notice but also direct in a tripartite written agreement that the first pledgee deliver the collateral immediately to the second pledgee upon repayment of the debtor's loan. In this way, there will be no gap in perfection. See, B. Clark, The Law of Secured Transactions Under the Uniform Commercial Code, ¶ 7.7[2], 7–17, S7–7 (1980 and Supp.1987) (describing bailees with notice under UCC § 9–305).

chasers would not have notice that the debtor did not have unlimited use of its property. We note that under the common law, a pledgee who becomes a bailee with notice may surrender possession of the collateral if he or she does not wish to be under a duty to a subsequent pledgee.

The facts before us show that Bank received notice in February, 1991 of FCIDC's interest in the Passbook and that Bank maintained the notification letter in its files. FCIDC also offered evidence that following the June, 1990 closing, an oral agreement existed between it and Bank concerning Bank's possession of the Passbook. Although FCIDC notified Bank of its interest in the Passbook eight months [19] after the closing took place, the record lacks any evidence that Bank attempted to avoid holding the Passbook for both itself and FCIDC or that FCIDC asked Bank to act outside the scope of their relationship. Bank therefore waived whatever rights it had to claim that it did not have notice under the common law and UCC definitions of a bailee with notice.

In addition, we agree with FCIDC that neither the common law nor the UCC prevents an interested pledgee from acting as a bailee with notice to perfect the security interests of additional pledgees. Like any pledge where the collateral is held by a third-party bailee or first pledgee, future creditors and purchasers would be presumptively on notice that the property was encumbered when, upon the second pledgee's inquiry, the debtor was unable to produce the collateral. In addition, senior creditors should not be given the authority to veto third-party commercial transactions between a debtor and a subordinate creditor. This argument rests both in equity and in the policy favoring the free extension of credit.

### CONCLUSION

Based on the foregoing discussion, we hold that Bank was a common law bailee with notice whose possession of the Pass-

book perfected FCIDC's interest in the collateral. FCIDC's motion for relief from stay is granted, and any interest that FCIDC has in the Passbook is deemed abandoned.

The parties shall settle an order on five days notice consistent with this Memorandum of Decision.

---

**19.** We do not decide whether FCIDC was perfected during the eight months preceding notification to Bank.