### In re LDM DEVELOPMENT CORPORATION, Debtor.

**Banktuptcy No. 96–36793.**

United States Bankruptcy Court,
D. Minnesota,
Third Division.

Aug. 18, 1997.

Nauni J. Manty, Minneapolis, MN, for debtor.

Richard E. Berger, St. Paul, MN, for movant.

## ORDER

DENNIS D. O'BRIEN, Chief Judge.

This matter came before the Court on Leon and Marina Larson's Motion for Relief from Stay. Appearances are as noted on the record. Based on the Federal and Local Rules of Bankruptcy Procedure, the Court now makes this ORDER.

## I.

### FACTS

On October 1, 1996 Gibraltar Title Agency, LLC (Gibraltar) conducted a closing on a parcel of property LDM was selling. In connection with that transaction, Gibralter, as agent for Chicago Title Company, issued a title insurance policy insuring marketability of title to the property. In conducting a title search, Gibraltar had discovered a lien in favor of Vasko Rubbish Removal, Inc. in the amount of $10,802.96 on the property. At closing, Gibraltar required LDM to deposit $10,802.96, out of the sale proceeds, into an account to ensure that the lien on the property would be satisfied, protecting Chicago Title from a potential claim against the title insurance policy.[1] The transaction was me-

morialized in a written agreement entitled "Agreement With Deposit to Protect Against Defects in Title" (Deposit Agreement).

On October 9, 1996, the Larsons loaned LDM $10,491.62. In connection with that loan, LDM granted the Larsons a security interest, by written security agreement in the "escrow deposit in sum of $10,800 held by Gibraltar Title Agency, LLC." *Security Agreement,* dated Oct. 9, 1996. Also executed in connection with this loan was a UCC–1 financing statement and a warrant of attorney to confess judgment. These documents were delivered by the Larsons' counsel directly to Gibraltar. The Larsons did not file the financing statement with the Secretary of State in connection with this transaction.

LDM filed its Chapter 11 petition on November 22, 1996. Vasko's lien was subsequently paid from a source other than the account covered by the Deposit Agreement. The Larsons' loan is in default, and they have now moved for relief from the automatic stay to collect the funds from Gibralter. The Debtor objects to the motion, claiming that the Larsons failed to perfect their security interest and that the LDM is entitled to avoid it under 11 U.S.C. § 544(a).

LDM claims that the October 9, 1996 transaction resulted in the grant by LDM to the Larsons of a security interest in its rights under the Deposit Agreement, which, according to the Debtor, was a contingent right to payment. A security interest in a right to payment is a general intangible, and can only be perfected by filing a financing statement with the Minnesota Secretary of State.[2] The debtor argues that since the Larsons failed to file their financing statement, their interest is unperfected.

The Larsons claim that LDM granted them a security interest in the funds on deposit, and that the collateral was money within the meaning of Minn.Stat. § 336.9–305. They argue that they perfected their interest by giving notice to Gibralter, which was, according to the Larsons, a "bailee" under the statute for purposes of perfection.

---

1. LDM had made arrangements with Vasko to pay the lien obligation in monthly installments.

2. Minn.Stat. 336.9–302.

The parties agree that if the interest is perfected, the Larsons are entitled to relief from stay. They also agree to determination of the issue of the rights of the parties in the account in the context of this motion proceeding.

## II.

## DISCUSSION

### The Deposit Agreement, Interests And Relationship of The Parties.

The Deposit Agreement and the account to which it refers are described by the parties as an escrow agreement and an escrow account. Both LDM and the Larsons, however, also claim that the transaction was a secured transaction, and that the relationship of the parties was debtor/creditor. The Deposit Agreement is not an escrow agreement; it is a security agreement. The relationship of LDM and Gibralter was not an escrow relationship; it was that of a debtor/creditor. The distinction is important because the interests and rights of the parties are different, depending on the nature of the transaction and relationship of the parties.

### The Nature Of Escrow.

 Under Minnesota law, an escrow results when property is delivered to a stranger for the benefit of parties in interest to a transaction.

> To make a deed an escrow, it must be delivered to a stranger, to be held until the condition is performed, then to be delivered to the grantee. *Raymond v. Smith,* 5 Conn. 555, 559. In a very early and authoritative definition of an 'escrow' it is declared to be 'where one doth make a deed and deliver it unto a stranger until such condition be performed, and then delivered to him to whom such deed is made to take effect as his deed, and so a man may deliver a deed and such delivery is good.' Shep. Touch. c. 4, § 58. The conditions of the deposit of a deed in escrow must be definitely expressed, and the deed committed to a third party for delivery upon the performance of the conditions; but it is not necessary that any particular form of words should be used at the time of its deposit, but the terms of the escrow are to be derived from all the circumstances, and it obviates all questions as to the intention of the parties if at the time of the deposit, or, as it is called, the first delivery, it is expressly declared that it is to be delivered upon the performance of such conditions. *Murray v. Stair,* 2 Barn. & C. 87; *Gaston v. City of Portland,* 16 Or. 255, 19 P. 127. *Thoraldsen v. Hatch,* 87 Minn. 168, 91 N.W. 467, 468 (1902).

An escrow holder is not the agent of either party to an escrow transaction prior to the fulfilment of the conditions upon which the escrow agreement operates.

> Fundamental to the existence of an escrow is the transfer of the escrow instrument into the hands of a third party as depository. Prior to the happening of any of the conditions upon which the escrow agreement operates, the escrow agent is not empowered to act for either party. Although he may be an agent for one of the parties in other respects, with respect to the instrument in escrow his powers are solely limited to those stipulated in the escrow agreement. *Zweifach v. Scranton Lace Co.,* 156 F.Supp. 384, 393 (M.D.Pa. 1957); *Qualley v. Snoqualmie Valley Bank, supra* [136 Wash. 42, 238 P.2d 915 (1925)].

*In re Dolly Madison,* 351 F.Supp. 1038, 1042 (E.D.Penn.1972); aff'd 480 F.2d 917 (3rd Cir. 1973).

When property is delivered into escrow, both the depositor and the ultimate grantee are left with contingent rights to the property, pending the happening of the escrow conditions.

> An escrow is something more than a contract—it is a method of conveying property. See generally, 28 Am.Jur.2d Escrow § 1 (1966); 30A C.J.S. Escrows § 1 (1965). When property is delivered in escrow the depositor loses control over it and an interest in the property passes to the ultimate grantee under the escrow agreement. *Newcomb v. Farmers Home Administration,* 744 F.2d 621, 624 (8th Cir.1984).

In *Newcomb,* when funds were placed in escrow, pending appeal, to satisfy a judgment in favor of FHA, both the judgment debtor depositor and FHA were left with interests

in the funds described as contingent rights to the funds.

> When the escrow involved in this case was created the interest transferred to the FHA was a contingent right to the escrowed funds, that is, a right to the funds if this court affirmed the judgment for the United States. The interest left in Newcomb by this transfer was a contingent right to the funds if this court reversed the judgment for the United States.
>
> *Newcomb,* 744 F.2d at 626.

An escrow and secured transaction cannot exist at the same time regarding the same property and the same parties.

> [t]he simultaneous existence of an escrow and a pledge is a legal impossibility.
>
> *citation omitted.*
>
> It is fundamental to the existence of a pledge that the pledgor give up possession of his property and place it in the hands or control of the pledgee. Although possession by the pledgee may be accomplished through the use of an agent, the pledgee must have absolute dominion and control over the property. *citations omitted.* Fundamental to the existence of an escrow is the transfer of the escrow instrument into the hands of a third party as depository. Prior to the happening of any of the conditions upon which the escrow agreement operates, the escrow agent is not empowered to act for either party. Although he may be an agent for one of the parties in other respects, with respect to the instrument in escrow his powers are solely limited to those stipulated in the escrow agreement. *citations omitted.*
>
> *In re Dolly Madison Industries,* 351 F.Supp. at 1042.

A transaction and relationship can have the attributes of both escrow and secured transaction, but at any given time can be only one or the other with respect to the same parties. Thus, where parties to a secured transaction provided that the collateral be delivered into escrow to a third party under an escrow agreement that required the escrow holder to act as agent for both parties, the transaction nonetheless remained a secured transaction. *In re Copeland,* 531 F.2d 1195 (3rd Cir.1976).

*The Deposit Agreement Is a Security Agreement.*

A main purpose of the Uniform Commercial Code as set out in Minn.Stat. § 336.1–102(2)(a) is to simplify and clarify the law governing commercial transactions. The UCC is to be "liberally construed and applied to promote its underlying purposes and policies." Minn.Stat. § 336.1–102. Another important purpose of the Code is to make the law of commercial transactions, as far as reasonable, liberal and nontechnical. James J. White & Robert S. Summers, Uniform Commercial Code § 4 (3rd ed.1988). The following discussion is presented with this in mind.

The Deposit Agreement in this case does not purport to be an escrow agreement. The term "escrow" is not used anywhere in the document. More importantly, Gibralter received and held the funds as collateral, and as agent for Chicago Title Company. The Agreement provides that "... the Grantor [LDM] hereby transfers to the Title Company funds as set forth below, to indemnify Title Company as herein provided...." *Exhibit 1 to Affidavit of Jeffrey Nycklemoe, Exhibit A To Second Supplemental Memorandum of Law For Leon D. Larson and Marina E. Larson,* May 1, 1997. The Deposit Agreement is a security agreement. The transaction was a secured transaction; and, Chicago Title and LDM maintained a creditor/debtor relationship regarding the funds.

*The Collateral And Its Perfection.*

The collateral taken by Chicago Title was $10,800 in LDM funds. The collateral was money.[3] Under the Minnesota version of the Uniform Commercial Code, a

---

**3.** Minn.Stat. § 336.1–201(24) defines "money" as:

> a medium of exchange authorized or adopted by a domestic or foreign government and includes a monetary unit of account established by an intergovernmental organization or by agreement between two or more nations.

The Comments to the Uniform Commercial Code state that, "[t]he narrow view that money is limited to legal tender is rejected,"

security interest in money can be perfected only by the secured creditor taking possession of it. Minn.Stat. § § 336.9–304(1) and 336.9–305. Minn.Stat. § 336.9–305 provides, in pertinent part:

> [a] security interest in ... money ... may be perfected by the secured party's taking possession of the collateral. If such collateral other than goods covered by a negotiable document is held by a bailee, the secured party is deemed to have possession from the time the bailee receives notification of the secured party's interest.

Upon execution of the security agreement by LDM and Chicago Title taking possession of the funds, Chicago Title became a pledgee with a perfected security interest in the funds. The nature and status of Chicago Title's interest did not change by deposit of the funds in its bank account. Chicago Title remained pledgee with a perfected possessory security interest in the funds. *In re O.P.M. Leasing Services*, 46 B.R. 661, 670 (Bankr.S.D.N.Y.1985) [validity of a security interest in money is not dependent upon collateral being held in drawer or lockbox. Security interest in money, which is perfected by possession, remains protected by Article 9 even if the money is subsequently deposited in a bank account].

*LDM's Post Transaction interest In The Funds.*

 The nature and status of LDM's rights in the collateral did not change through deposit of the funds by Chicago Title, either. LDM argues that the transaction with Chicago Title left LDM with a general intangible, simply a contingent right to payment under the Deposit Agreement.

Cases cited in support of the premise include: *In re Vienna Park Properties*, 976 F.2d 106, 115–117 (2nd Cir.1992) [debtor's right to receive funds pursuant to an escrow account is a general intangible which defeated a creditor who attempted to perfect pursuant to 9–305]; *Christison v. U.S.*, 960 F.2d 613 (7th Cir.1992) [right of tenant to receive percentage of tenants earnings collected and held by landlord is a general intangible right to payment, not an interest in money]; *Spears v. Michigan National Bank*, 888 F.2d 1299 (10th Cir.1989) [debtor's interest under a purchase and escrow agreement was a general intangible]; *First National Bank of Minneapolis v. United States*, 1987 WL 149720 (D.Minn.) [interest in an asset coverage trust account was a general intangible, not money]; and, *United States v. First National Bank of Memphis*, 458 F.2d 560 (6th Cir.1972) [surplus proceeds from insurance policies placed in a bank account for debtor by secured creditor after foreclosing on the policies, resulted in a general intangible right to payment in favor of the debtor, not an interest in money]. In all of the cited cases, the interests involved arose either out of true escrow arrangements (not secured transactions), or other sources that were general rights to payment. None of the cases involved the initial grant of a security interest in money, which was placed into an account by the pledgee.[4]

It makes no sense to recognize the continued validity of Chicago Title's position as perfected pledgee of the funds on the one hand; and, to characterize the rights of LDM as the holder of a contingent non-reified, or general intangible, right to payment on the

---

4. In *Vienna Park*, the debtor had entered a true escrow agreement and deposited funds. The debtor subsequently granted security interests of the debtor's rights under the escrow agreements to two nonparticipating banks, which did not file financing statements. The banks argued 9–305 perfection, claiming that *O.P.M. Leasing Services*, 46 B.R. 661 (Bankr.S.D.N.Y.1985) supported their position that the escrow accounts were money, not general intangibles, quoting that court's finding: "[s]ince the escrow account is, for all intents and purposes, money, it is not a general intangible." *Id.* at 670 n. 5. The *Vienna Park* court unnecessarily sought to distinguish *Vienna Park* from *O.P.M* by drawing distinctions between the agreements and by pointing to the

fact that the banks in *Vienna Park* were not parties to the escrow agreement. *See, Vienna Park Properties*, 976 F.2d at 116, 117 Actually, both cases were decided on the same grounds: that the debtors had participated in true escrow arrangements; and, upon delivery of funds into escrow they were left with general intangible contingent rights to payment, which, in the case of *Vienna Park*, is what the debtor granted the banks a security interest in. The discussion by the *O.P.M.* court, regarding the agreement as a secured transaction, was the alternative analysis that the court would have applied in the event that the court had not found the arrangement to be a true escrow, but rather a secured transaction. *See, O.P.M. Leasing*, at 668, 669.

other hand. If LDM had no rights in the funds, then the funds could not serve as collateral, and the transaction could not be a secured transaction. There would exist no pledge, no collateral, and consequently no pledgor or pledgee. Just as Chicago Title retained the rights and obligations of a perfected pledgee of the funds, LDM retained the rights and obligations of a non possessory pledgor after the transaction. Those rights included the right to further pledge the collateral.

### The Pledge To the Larsons.

*The Larsons were Junior Pledgee Of the Funds.*

On October 9, 1996, LDM executed a note, warrant to confess judgment, security agreement, and financing statement in favor of the Larsons. The security agreement described the collateral as:

> escrow deposit in sum of $10,800 held by Gibralter Title Agency, LL located at 7300 France Ave, S., Edina, MN 55435 in connection with the sale of property at 645 Charles Ave., St. Paul, MN.

> *Exhibit B to Motion For Order Granting Relief From Automatic Stay,* April 7, 1997.

The following day, the Larsons served an executed copy of the security agreement and financing statement upon Gibralter, as agent for Chicago Title. The notice was received.

The Larsons argue that they are junior pledgee of the funds; and, that their pledge was perfected by the notice served on Gibralter, which was, as to them, a "bailee" within the meaning of Minn.Stat. § 336.9-305. The statute provides, in pertinent part:

> [a] security interest in ... money ... may be perfected by the secured party's taking possession of the collateral. If such collateral ... is held by a bailee, the secured party is deemed to have possession from the time the bailee receives notification of the secured party's interest.

LDM argues that the grant to the Larsons was of a security interest in LDM's general intangible contingent right to payment under the Deposit Agreement. As discussed earlier, the Deposit Agreement was a security agreement, which was part of a secured transaction, not an escrow or other agreement that created intangible contingent rights to payment. LDM did not acquire an intangible interest from the agreement, but retained a pledgor's nonpossessory interest in the collateral funds which were the subject of the security agreement. It is the pledgor's interest in the collateral that was pledged to the Larsons, who became junior pledgee of the funds.

### The Larsons Perfected Their Pledge.

The Debtor argues that Gibralter was the agent of another creditor, and could not serve as a bailee for purposes of deemed possession by the Larsons. However, a senior pledgee can serve as a bailee under 9-305 for purposes of perfection of a junior pledge. "As long as a pledgee is not controlled by a debtor, neither the statute nor the policies underlying 9-305 prohibit a pledgee from serving as a bailee for an additional pledgee." *In re Housecraft Industries, USA, Inc.,* 155 B.R. 79, 89 (Bankr.D.Vt.1993).[5] Such a finding is consistent with the prior generally accepted common law long ago recognized by the Eighth Circuit.

> The owner of personal property subject to a prior pledge, under which the pledgee has the actual possession and control of the thing pledged, may lawfully pledge his remaining interest therein without a deposit of the property with the second pledgee, by a contract or conveyance to that effect and notice thereof to the first pledgee, who will then be deemed to hold the property in trust for both pledgee as their interest exist.

> *Pierce v. Nat'l Bank of Commerce in St. Louis,* 268 F. 487, 495 (8th Cir.1920).

The policy behind allowing a pledgee to hold the property for the benefit of both herself and a subsequent bailee was set out in *In re Chapman* where the court stated:

> "rule that notice to a one (sic) pledgee perfects an additional pledge of the relevant collateral." *Housecraft,* 155 B.R. at 89.

---

**5.** *Housecraft* involved a deposit account not subject to the UCC. However, the bankruptcy court thoroughly analyzed the common law of pledges and how section 9-305 adopted the common law

since only one secured party can have possession of an instrument at one time, unless we hold that one secured party can hold for all we would be severely and unnecessarily restricting opportunities to finance by security agreements covering instruments in large amounts.

*In re Chapman*, 5 U.C.C. Rept.Serv. 649 (Bankr.W.D.Mich.1968).

The appropriate focus is not be on the bailee's interest in the money, but on the debtor's control over the collateral. If the debtor exercises unfettered control over the collateral or over the bailee, then a proper bailment can not exist for purposes of 9–305 perfection. The Third Circuit has ruled that:

> possession by a third party bailee, who is not controlled by the debtor, which adequately informs potential lenders of the possible existence of a perfected security interest satisfies the notice function underlying the "bailee with notice" provision of § 9–305.

*In re Copeland*, 531 F.2d 1195, 1204 (3rd Cir.1976).

As it is undisputed that the LDM had no control over either the funds or over Gibraltar, the notice requirement of § 339.9–305 was satisfied upon the delivery to Gibralter of notice of the pledge. Gibraltar, as agent for the senior pledgee Chicago Title, qualified as a bailee with notice under Minn.Stat. § 339.9–305. The Larsons' junior pledge in the funds was perfected.

### III.

### DISPOSITION

Based on the foregoing, it is hereby **ORDERED:**

The Larsons have a perfected security interest in $10,800 in funds held by Gibralter Title Agency under *Agreement With Deposit To Protect Against Defects In Title*, executed by LDM and Gibralter as agent for Chicago Title Company on October 1, 1996; and, the Larsons are granted relief from stay to enforce their rights in the collateral accordingly.